[No. G007029. Fourth Dist., Div. Three. Feb. 28, 1990.]

JOHNSON CONTROLS, INC., Plaintiff and Respondent, v.
FAIR EMPLOYMENT AND HOUSING COMMISSION, Defendant
and Appellant;
QUEEN ELIZABETH FOSTER, Real Party in Interest and
Respondent.

518

522

COUNSEL

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Marian M. Johnston and Manuel M. Medeiros, Deputy Attorneys General, for Defendant and Appellant.

Foley & Lardner, Stanley S. Jaspan, Susan R. Maisa, Wickwire, Gavin & Gibbs and Gerald A. Griffin for Plaintiff and Respondent.

Joan M. Graff, Robert Barnes and Patricia A. Shiu for Real Party in Interest and Respondent.

OPINION

STANIFORTH, J.*—The California Fair Employment and Housing Commission (Commission) appeals the trial court's order granting a writ of mandate, vacating the decision of the Commission which struck down the fetal protection program introduced and implemented by respondent, Johnson Controls, Inc. (the Company), at its Globe automotive battery plant located in Fullerton, California.

The real party in interest here, Queen Elizabeth Foster (Foster), applied for one of the jobs subject to female exclusion. She was denied employment because she declined to produce medical evidence of infertility. She thereafter filed a complaint with the Commission, and the Commission in turn issued an accusation initiating administrative proceedings. The decision of the Commission is presently brought before this court.

This dispute is fraught with public policy considerations. On one hand, society certainly has an interest in safeguarding the well-being of its employees, their families and, indeed, the public generally from industrial hazards. This societal interest has found its expression in many state and federal occupational and environmental standards. On the other hand, society also has a substantial interest in safeguarding equal employment opportunities for women. This interest finds its expression in state and federal antidiscrimination statutes, and in the California Constitution, article I, section 8. (See also tit.VII of the Civil Rights Act of 1964 (42 U.S.C.

---

* Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

§ 2000e et seq.); *Rojo* v. *Kliger* (1990) 52 Cal.3d 65 [276 Cal.Rptr. 130, 801 P.2d 373].

Globe Battery, a division of the Company, manufactures automobile batteries, the principle component of which is lead oxide. Lead is dangerous to the health and well-being of humans and presently available research indicates that lead may be hazardous to children and fetal offspring at exposure levels lower than those which appear adversely to affect adults. Globe Battery has a comprehensive lead hygiene program for the protection of its adult employees. It also has a "fetal protection program" implemented for the stated purpose of protecting the health and well-being of unborn offspring. Under this program, women of childbearing age and capacity are categorically excluded from certain jobs. Admission to those jobs requires proof of infertility. Globe Battery asserts it is not necessary to exclude men from these jobs because existing research appears to indicate that, although fetal offspring may be affected, sex cells themselves are not affected by lower levels of lead exposure.

The Company's fetal protection program (FPP) was not mandated by any state or federal rules. It was voluntarily adopted and enforced by Globe Battery. The program unquestionably discriminates against women. Only women are affected by its terms. Thus, the question presented to the Commission was whether Globe Battery was exempt from the statutory and constitutional prohibitions against sex discrimination because the employer sought to justify the discrimination as necessary to effectuate a voluntarily assumed responsibility for the protection of unborn offspring. The Commission concluded that Globe Battery could claim no such exemption.

### FACTS

Queen Elizabeth Foster (Foster) was and is a young, physically able woman seeking and needing employment. She applied for a job as cast-on-strap loader (COS loader) at the Globe Battery plant in Fullerton.[1] The Company refused to hire Ms. Foster pursuant to its FPP, because she declined to provide medical verification of an inability to bear children. At the time she applied for the job, she was neither pregnant nor planning to

---

[1] A COS loader is part of a team in a battery element assembly complex. The loader removes stacks of lead oxide battery plates as they are discharged from a stacking machine, tamps the stacks, and places them on a COS machine, which bands the plates together with straps. This operation requires the COS loaders physically to handle the product, exposing the worker to lead dust and fumes. The mean blood level of COS loaders at the Fullerton plant was 40.3ug/100ml and their median blood-lead level was 42ug/100ml. The mean air-lead level exposure of COS loaders was 52.4ug/m³ and the median exposure was 44.0ug/m³.

become pregnant. The Company's FPP had been adopted some three months before Foster applied for a job. Its major provisions were:

"a. Women of childbearing capacity would not be hired in those jobs where, within the past year, a single blood lead sample result from any incumbent worker was at least 30ug/100ml or a single air lead sample result from any one incumbent was at least 30ug/m³ (the 'unacceptable' jobs.)

"b. Women of childbearing capacity would not be hired in any job where the blood lead sample result of incumbent workers was below 30ug/100ml (the 'acceptable' jobs) but from which the woman employee would have job bidding, bumping, promotion or transfer rights to an 'unacceptable' job, pursuant to the union agreement.

"c. Any woman employee who worked in an 'unacceptable' job at the time of the adoption of the FPP and who was capable of bearing children would be allowed to continue working in her job if she maintained a blood lead reading of below 30ug/100ml (the 'grandmother' clause.) Incumbent female employees whose blood lead levels exceeded 30ug/100ml were to be given time to try to bring their own blood lead levels down and, if unsuccessful, were to be transferred to an 'acceptable' job at no loss of pay or benefits.

"d. Blood lead samples were to be taken of all women employees of childbearing capacity on a frequent basis. These women were also to receive counseling regarding lead effects and the importance of good personal hygiene and work practices.

"e. Johnson specifically discouraged its female employees from being sterilized in order to comply with the FPP."

Because the Company refused to hire Foster, she filed a complaint with the Commission. After an extensive hearing, the Commission found the Company's hiring practices were discriminatory on the basis of sex, that the FPP was not based upon a bona fide occupational qualification (BFOQ), and ordered the Company to hire Foster and to cease and desist from implementation of the FPP.

Evidence before the Commission shows the Company's Fullerton plant manufactures lead acid batteries for use in automobiles. A principal component in the manufacturing of the battery is lead oxide. Lead is a highly toxic substance which causes a variety of health effects in human beings, ranging from fatigue and irritability at relatively low levels of exposure to loss of consciousness and seizures at high exposure levels. Lead absorption may be

measured in the amount of lead in the blood of an exposed individual, stated in micrograms of lead per hundred milliters of whole blood (ug/100ml).

Young children experience adverse effects from lead absorption at lower blood levels than do adults. The federal Centers for Disease Control (CDC) considers children with blood-lead levels of 25ug/100ml to have an excessive level absorption which requires monitoring and treatment to avoid long-term effects, such as fatigue, hyperactivity, irritability and sudden behavioral changes. Medical science has found no practical way to measure blood-lead levels in a fetus. Medical experts, by the process of extrapolation, conclude a fetus is at least as susceptible to the effects of lead as are young children. Because lead in the blood of a pregnant woman passes directly to the fetus through the placenta, a fetus carried by a woman with an elevated blood-lead level is at risk of adverse effects. There is an increased risk of spontaneous abortion. A child born alive has an increased risk of neurological effects manifested by irritability, hyperactivity, lessened attention span, and learning difficulty.

Both the California Occupational Safety and Health Administration (CAL/OSHA) and the federal Occupational Safety and Health Administration (OSHA) have adopted lead exposure standards to protect health of workers. *These standards require that workers be removed from worksites if their blood-lead level equals or exceeds 50ug/100ml, based on an average of three consecutive blood tests.* Workers who have been removed pursuant to the lead standard may be returned to their former jobs when their blood-lead level is reduced to 40ug/100ml or lower.

The preamble to the OSHA lead standard and its attachments states that the male and female workers who are exposed to lead should keep their blood-lead levels below 30ug/100ml if they plan to conceive because of the increased adverse effects upon the offspring. *These OSHA lead standards do not include a different standard for female workers, nor do they require that fertile women be excluded from jobs involving lead exposure.*

The Company maintains a comprehensive lead hygiene program at its Fullerton plant. This includes biological monitoring and medical surveillance of employees, education, counseling and training of employees. A personal hygiene program, a respirator wear program, air sampling, housekeeping measures and engineering controls are in effect. Thus the Company is in substantial compliance with OSHA standards for control of lead exposure in its workplace. Pursuant to the Company's lead exposure policies described above, any worker having a blood-lead level of 50ug/100ml or higher will be transferred without loss of pay or benefits to a job where the

average blood-lead level of the incumbent workers is below 30ug/100ml. A worker can reduce his or her exposure to and absorption of lead by practicing good personal hygiene, including such measures as washing before eating or smoking, taking a shower and changing clothes at the end of the workday, and avoiding touching his or her face with lead-contaminated hands. New employees are at greatest risk of high lead exposure and blood-lead levels because they have not yet mastered proper hygiene techniques.

In August of 1982, the Company instituted its FPP in all of its battery plants, including Fullerton. The FPP applied to all women of childbearing capacity, defined as "all women except those whose inability to bear children is medically documented." The program expressly excluded male applicants and employees.

The most significant feature of the FPP was a blanket prohibition of hiring of any new female employees capable of bearing children at any production job at the Fullerton plant. Fertile women could not be hired into those jobs where, within the past year, a single blood sample of any incumbent worker measured at least 30ug/100ml of lead, or a single air-lead sample from any incumbent worker that measured at least 30ug/m³. Under the FPP all production jobs were unacceptable for female applicants who could not provide medical documentation of sterility.

## THE FINDINGS

The Commission found the adult lead-exposed workers are not themselves at risk at blood-lead levels of 30ug/100ml or less. Finding number 12 of the Commission provides, "The preamble to the federal OSHA lead standard and its attachments both state that both males and females exposed to lead who wish to plan pregnancies should keep their blood lead levels below 30ug/100ml because of possible adverse effects to the fetus. The lead standard itself does not establish any standard specific to women, stating, in the preamble's attachments, that *there is no basis in the record for preferential hiring of men over women in the lead standard, nor will this final standard create a basis for exclusion from work of any person, male or female, who is capable of procreating.*" (Italics added.)

In finding number 13, the Commission stated, "*Lead-exposed fertile males with blood lead levels of as low as 41ug/100ml have been shown to experience a decrease in the motility and number of sperm, leading in most cases to a loss of fertility and in some cases to spontaneous abortions of the embryo/fetus.*" (Italics added.)

Finding number 19 of the Commission is, "From 1977 to 1982, [the Company] implemented these voluntary guidelines at all of its battery plants except Fullerton. *Although [the Company's] management was aware that some female employees of childbearing capacity became pregnant with blood lead levels greater than 30ug/100ml it did not track the pregnancies of these women or document the effects, if any, of the lead exposure on their infants.*" (Italics added.)

Finding number 28 is, "Because of [the Company's] policy of refusing to hire fertile women in 'acceptable' jobs if they would at some time be eligible for promotion or transfer to 'unacceptable' jobs, fertile women were excluded from hire in all of the production jobs at [the Company's] Fullerton plant in April 1985, even though only 34.89 percent of the production jobs were 'unacceptable' in terms of their blood lead sample results."

Finding number 29 declares, "In March 1983, respondent's Fullerton plant employed 373 persons, 324 of whom were battery production employees. Of these 324, 304 were men and 20 were women. Of these 20 women, five or six were women of childbearing capacity. [The Company] employs up to 50 [COS] loaders at its Fullerton plant, depending on the number of shifts it runs. Both at the time of [Foster's] application and at time of hearing, no women were employed as [COS] loaders at [the Company's] Fullerton plant."

After lengthy hearings, the Commission found on August 4, 1987, that the Company's exclusion of Foster from the job as a COS loader constituted an unlawful sex discrimination. The Commission further found that the Company had failed to justify its exclusion by proof of a BFOQ by proving that: (1) all or substantially all fertile women are unable safely and efficiently to perform the job of COS loader; and (2) the essence of the business operation would be undermined if the Company were to employ fertile women as COS loaders. The Commission also found that the Company could not justify exclusion of Ms. Foster on the grounds of "business necessity" since that defense is available *only to excuse a facially neutral practice having only an incidental adverse effect on women.*

## THE LEGAL PROCEEDINGS

The Company responded, and sought a writ of mandamus (Code Civ. Proc., § 1094.5), alleging the Commission's decision was contrary to law because it erroneously refused to apply the business necessity and/or the BFOQ defenses to its FPP as required by a correct interpretation of the Fair Employment Practices Act. After hearing the petition, the trial court ruled

that the Commission erred as a matter of law in failing to consider the business necessity defense as set forth in *Hayes* v. *Shelby Memorial Hosp.* (11th Cir. 1984) 726 F.2d 1543, and that the evidence demonstrated that the Company had proven there was a substantial risk of harm to the fetus and the potential offspring of women employees from the woman's exposure to lead in the manufacturing process of automotive lead acid batteries and that the risk does not also apply to the offspring of male employees. The court remanded the case to the Commission "for the purpose of considering the business necessity defense as set forth in *Hayes* v. *Shelby Memorial Hospital* [, *supra*,] 726 F.2d 1543, and further to determine whether there are acceptable alternative policies which would better accomplish the purpose of promoting fetal health or that would accomplish the purpose with less discriminatory or no discriminatory impact on females in general and specifically on the real party in interest, Queen Elizabeth Foster." From that judgment, the Commission appeals.

## DISCUSSION

### I

■ The Commission contends the trial court erred in exercising its independent judgment by reweighing the evidence rather than using the substantial evidence test, to determine whether the Commission's findings were supported by the evidence. We address this contention first because it involves the appropriate standard of review in this case.

■ The Commission's ruling was reviewable in the superior court by a petition for administrative writ of mandate (Code Civ. Proc., § 1094.5; see *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 137-140 [93 Cal.Rptr. 234, 481 P.2d 242].) Under section 1094.5, if the order or decision of an administrative agency substantially affects a fundamental vested right, the superior court must exercise its independent judgment to determine whether the agency's findings are supported by the evidence. (*Id.* at p. 143.) If, on the other hand, the order or decision of the agency does not involve or substantially affect a fundamental vested right, the superior court's inquiry is limited to a determination of whether the findings are supported by substantial evidence in light of the whole record. (*Id.* at p. 144.)

■ In *Northern Inyo Hosp.* v. *Fair Emp. Practice Com.* (1974) 38 Cal.App.3d 14 [112 Cal.Rptr. 872], the Court of Appeal stated, "Applying *Bixby* guidelines, [the employer's] right to establish its employment practices and procedures and to impose conditions of employment can in no sense be termed a fundamental vested right. While the right to pursue a

lawful business or occupation is a fundamental right [citing cases], there is no vested right to conduct a business free of reasonable governmental rules and regulations (see *Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 145-146; *Beverly Hills Fed. S. & L. Assn.* v. *Superior Court* [1968] 259 Cal.App.2d 306, 316-317 [66 Cal.Rptr. 183].)" (*Id.* at p. 23; see also *American National Ins. Co.* v. *Fair Employment & Housing Com.* (1982) 32 Cal.3d 603, 607 [186 Cal.Rptr. 345, 651 P.2d 1151]; *Kerrigan* v. *Fair Employment Practice Com.* (1979) 91 Cal.App.3d 43, 49-50 [154 Cal.Rptr. 29], cert. den. 444 U.S. 930 [62 L.Ed.2d 187, 100 S.Ct. 273].)

■ Pursuant to the foregoing guidelines, the superior court should have applied the substantial evidence test, not the independent judgment test, to review the evidence before the Commission. (*American National Ins. Co.* v. *Fair Employment & Housing Com., supra,* 32 Cal.3d at p. 607.)

■ On appeal, this court exercises the same function as the trial court and must decide if the agency's findings were based on substantial evidence. Neither court may reweigh the evidence, and both courts must view the evidence in the light most favorable to the Commission's findings and indulge in all reasonable inferences in support thereof. (*Taylor Bus Service, Inc.* v. *San Diego Bd. of Education* (1987) 195 Cal.App.3d 1331, 1340 [241 Cal.Rptr. 379]; *Goggin* v. *State Personnel Bd.* (1984) 156 Cal.App.3d 96, 103 [202 Cal.Rptr. 587]; *Maynard* v. *State Personnel Bd.* (1977) 67 Cal.App.3d 233, 237 [136 Cal.Rptr. 503].)

(5) This court's duty is to review the findings and actions of the Commission "and not the findings of the trial court." (*Taylor Bus Service, Inc.* v. *San Diego Bd. of Education, supra,* 195 Cal.App.3d at p. 1340.) To that end, this court must review the entire record to determine whether the Commission's findings and decision are supported by substantial evidence. (*Bixby* v. *Pierno, supra,* 4 Cal.3d at p. 143, fn. 10; *Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control* (1970) 2 Cal.3d 85, 94 [84 Cal.Rptr. 113, 465 P.2d 1].)

"We may not isolate only the evidence which supports the administrative finding and disregard other relevant evidence in the record. (See *LeVesque* v. *Workmen's Comp. App. Bd.* [1970] 1 Cal.3d 627, 638-639, fn. 22 [83 Cal.Rptr. 208, 463 P.2d 432]; Cal. Administrative Mandamus (Cont.Ed.Bar) Jan. 1974 Supp., § 5.75.) On the other hand, neither we nor the trial court may disregard or overturn the Commission's finding ' "for the reason that it is considered that a contrary finding would have been equally or more reasonable." ' (*Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control, supra,* 2 Cal.3d 85, 94; *Bowman* v. *Alcoholic*

*Bev. etc. Board* [1959] 171 Cal.App.2d 467, 471-472 [340 P.2d 652].) ▋ The ultimate issue in an administrative mandamus proceeding is whether the agency abused its discretion. An abuse of discretion is 'discretion exercised to an end or purpose not justified by and clearly against reason, all of the facts and circumstances being considered.' (*Brown* v. *Gordon* [1966] 240 Cal.App.2d 659, 666-667 [49 Cal.Rptr. 901]; *Schaub's, Inc.* v. *Dept. Alc. Bev. Control* [1957] 153 Cal.App.2d 858, 866 [315 P.2d 459].)" (*Northern Inyo Hosp.* v. *Fair Emp. Practice Com., supra,* 38 Cal.App.3d at p. 24.)

▋ This court must uphold the Commission's decision unless the review of the entire record shows it is so lacking in evidentiary support as to render the decision unreasonable. (*County of Alameda* v. *Fair Employment & Housing Com.* (1984) 153 Cal.App.3d 499, 503 [200 Cal.Rptr. 381].)

▋ Substantial evidence is defined as: " 'relevant evidence that a reasonable mind might accept as adequate to support a conclusion, . . .' " (*Hosford* v. *State Personnel Bd.* (1977) 74 Cal.App.3d 302, 307 [141 Cal.Rptr. 354]) or evidence of " ' "ponderable legal significance . . . reasonable in nature, credible, and of solid value." ' " (*Ofsevit* v. *Trustees of Cal. University & Colleges* (1978) 21 Cal.3d 763, 773, fn. 9 [148 Cal.Rptr. 1, 582 P.2d 88].)

▋ While the Commission's findings on questions of fact will be sustained if supported by substantial evidence on the record considered as a whole, yet, if the Commission committed any errors of law, the trial and appellate courts perform "essentially the same function" and are not bound by the Commission's legal conclusions. (*Lewin* v. *St. Joseph Hospital* (1978) 82 Cal.App.3d 368, 387 [146 Cal.Rptr. 892]; see also *City and County of San Francisco* v. *Fair Employment Housing Com.* (1987) 191 Cal.App.3d 976, 984 [236 Cal.Rptr. 716]; *Lowe* v. *Civil Service Com.* (1985) 164 Cal.App.3d 667, 676 [210 Cal.Rptr. 673].)

Since no material facts are in dispute, our task is to determine as a matter of law whether the Commission was correct in its finding of overt discrimination against women and whether it correctly stated the standard of justification. (*City and County of San Francisco* v. *Fair Employment & Housing Com., supra,* 191 Cal.App.3d 976, 984.) In doing so, we recognize the Commission's interpretation of the Fair Employment and Housing Act is entitled to great respect. (*Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 491 [156 Cal.Rptr. 14, 595 P.2d 592].)

## II

The section of the act pertinent here provides in relevant part: "It shall be an unlawful employment practice, *unless based upon a bona fide occupational qualification,* . . . [¶] (a) For an employer, because of the . . . sex of any person . . . to refuse to hire or employ the person . . . ." (Gov. Code, § 12940, italics added.) The Commission found "discrimination against women who are of childbearing capacity is sex discrimination under [that section], just as it is discrimination against women who experience pregnancy or childbirth. ([Cal. Code Regs.], tit. 2, §§ 7291.0, subds. (c) and (d), 7291.2, subd. (c).)"

California Code of Regulations, title 2, section 7291.0, subdivision (c) provides, "It is unlawful to refuse to hire a female because she is of child-bearing age." Government Code section 12945.5 states, "It shall be an unlawful employment practice for an employer to require any employee to be sterilized as a condition of employment." The evidence here is uncontradicted: Before a woman could obtain work under the fetal protection program, she must demonstrate, in effect, there is medical certainty that she is sterile.

## III

The code sections and regulations adopted and legal precedents are clear, plain and unambiguous. Gender based discrimination—a refusal to hire based upon sex—violates the letter and spirit of the law and all modern precedent. The Commission determined that a *"possibility of pregnancy"* as basis for refusal to hire should not be treated differently than a "gender based discrimination." We agree.

The Company's FPP is expressly directed to women; it does not apply to men. Although it purports to be limited to women of "child bearing capacity," it defines such women as "all women except those whose inability to bear children is medically documented." In short, the FPP bars all women of childbearing capacity from employment. An affidavit of sterility must be produced before any female will be employed. The claim that the FPP is facially neutral because it applies equally to all "persons" capable of having children flies in the face of the language of the FPP itself and the code sections and rules involved.

Pregnancy is a condition unique to women. It is not, however, a condition universally descriptive of *all* women. This practice discriminates on the basis of potential for pregnancy. It therefore excludes *only* women, but does

not exclude *all* women. Before 1976 lower federal courts that had considered this issue held generally job discrimination based on pregnancy was sex discrimination within the meaning of title VII. (See, e.g., *Satty* v. *Nashville Gas Co.* (6th Cir. 1975) 522 F.2d 850, 854-855, revd. in part (1977) 434 U.S. 136 [54 L.Ed.2d 356, 98 S.Ct. 347]; *Hutchinson* v. *Lake Oswego School Dist. No. 7* (9th Cir. 1975) 519 F.2d 961, 964-966; *Gilbert* v. *General Electric Co.* (4th Cir. 1975) 519 F.2d 661, 667, revd. (1976) 429 U.S. 125 [50 L.Ed.2d 343, 97 S.Ct. 401]; *Communication Workers* v. *American Tel. & Tel.* (2d Cir. 1975) 513 F.2d 1024, 1031.)

However, in 1976, the United States Supreme Court held pregnancy *qua* pregnancy was a "facially neutral" basis for discrimination in determining disability plan coverage. (*General Electric Co.* v. *Gilbert* (1976) 429 U.S. 125, 137 [50 L.Ed.2d 343, 354-355, 97 S.Ct. 401].) Applying what might be called a "disparate benefit" analysis, the court reasoned that allowance of disability benefits for pregnancy conferred upon women an additional benefit which men necessarily could not enjoy; as the court saw it, the practice constituted neither *adverse* treatment of women nor resulted in an *adverse* impact on women.

*Gilbert,* nevertheless, left open the possibility that, under some circumstances, discrimination based on pregnancy could be actionable under title VII. If, for example, the justification for the discrimination based on pregnancy were shown to be a mere pretext for discriminating against women, the discrimination would be actionable as disparate treatment. (429 U.S. at p. 137 [50 L.Ed.2d at p. 355].)

The next year, in *Nashville Gas Co.* v. *Satty* (1977) 434 U.S. 136 [54 L.Ed.2d 356, 98 S.Ct. 347], the Supreme Court "refined" its earlier *Gilbert* reasoning. In *Satty,* the court held that an employment policy which required women returning from pregnancy leave to forfeit their preleave seniority did have an "adverse impact" on women. Unlike the policy considered in *Gilbert* which, Justice Rehnquist reasoned, only declined "to extend to women a benefit that men cannot and do not receive," Nashville Gas Company's policy imposed on women "a substantial burden that men need not suffer." (*Id.* at p. 142 [54 L.Ed.2d at p. 364].) Because the employer failed to justify the adverse impact by proof that the policy constituted a business necessity, the employee prevailed. (*Id.* at p. 143 [54 L.Ed.2d at p. 365].)

Under the *Gilbert-Satty* formulation, a practice which overtly discriminated on the basis of pregnancy would be considered "gender-neutral," and lawful, if it could be said to confer a benefit upon women which men were

necessarily incapable of receiving; it would constitute disparate treatment of women, however, if reliance on the "gender-neutral" factor of pregnancy were found to be merely a pretext for discriminating against women (i.e., covert discrimination based on a "neutral" factor); and it would be unlawful as a facially neutral practice having an "adverse impact" on women, if the practice imposed a burden on women which men did not share, and the burden could not be justified as a business necessity.

*Satty* involved discrimination, not on the basis of a facially neutral *rule*, but rather on what was determined in *Gilbert* to be a "facially neutral" *characteristic.* Pregnancy-based discrimination is *categorical* exclusion, but a categorical exclusion based on a trait which the Supreme Court found not protected by title VII—except when the categorical exclusion based on the facially neutral trait categorically imposes a burden on women.

In 1978, Congress put an end to the foregoing most confusing benefit/burden analysis of sex discrimination based on pregnancy by enacting the Pregnancy Discrimination Act (PDA) as part of title VII. (42 U.S.C. § 2000e(k), Supp. II 1978 (Pub.L. No. 99-555, 92 Stat. 2076).) The PDA amended the definition section of title VII to provide that discrimination based on sex includes, inter alia, discrimination based on pregnancy, childbirth, and related medical conditions. *The effect of the PDA was to make categorical discrimination against a subclass of women, viz., pregnant women, discrimination on the basis of sex, requiring affirmative proof that, "nonpregnancy" was a bona fide occupational qualification.*

We conclude: A categorical discrimination against a subclass of women, to wit: all of childbearing capacity (not proven to be incapable by medical proof of sterility) is a blatant, overt violation of Government Code section 12940.

## IV

 The Company's FPP violates California laws and regulations for these further reasons. *Lead in the blood at certain levels creates risk to the offspring of both male and female employees.* Lead industry spokespersons argued to OSHA in its standard-setting hearing that "because fertile women require such low blood-lead levels, no feasible lead standard could possibly protect them, and that any standard that did so protect them would keep virtually all workers out of the workplace." OSHA responded to these criticisms in two ways. First, it rejected the implied assumption that lead poses much greater harm to the reproductive capacities of women than men, marshalling evidence that occupational lead harms the reproductive

capacity of males also and the chromosomes of both sexes. Second, OSHA justified a blood-lead level of 40ug/100g as being capable of protecting fertile women if supplemented by other provisions of the lead standard. The Commission had before it the OSHA rulemaking findings (40 Fed.Reg. 45936/2-3 (1975)). The rulemaking produced ample evidence confirming the grave danger lead poses to prospective mothers and fetuses. (43 Fed.Reg. 54934/2 (1978).)

OSHA found substantial evidentiary support for the view expressed by experts from the National Institute for Safety and Health and the American Health Foundation (AHF) that *a lead standard must protect the reproductive capacities of males as well as females.* For example, Dr. Jeanne Stellman, chief of occupational health toxicology at AHF, testified there is no justification for treating women separately from men. The blood level that would probably prevent adverse effects on spermatogenesis is comparable to the level probably necessary to prevent adverse fetal development.

On the basis of the evidence heard, OSHA generally agreed with expert witness Dr. Lancranjan's recommendation of a blood-lead level goal of 30ug/100g. However, because such a level might be infeasible, OSHA decided that a level of 40ug/100g would be sufficiently protective. OSHA concluded that other protective measures in the lead standard would compensate for any harm a difference of 10ug/100g in maximum blood levels might cause. These protective regulations include the 30ug/100g action level, *education* and *training* of workers planning families, careful use of medical surveillance, and the possibility of special precautions—even respirators—under the medical examination provisions of the medical removal program.[2]

In *United Steelworkers of America, Etc.* v. *Marshall* (D.C. Cir. 1980) 647 F.2d 1189 [208 App.D.C. 60], concerning the OSHA hearings, it is stated: "OSHA found evidence that lead-exposed males suffer serious harm to their spermatogenesis, including malformed sperm (teratospermia), decreased motility of sperm (asthenospermia), and decreased number of sperm (hypospermia). The chief study was that of the European neuroendocrinologist Dr. Lancranjan, whose work revealed adverse effects of spermatogenesis among lead-exposed workers with blood-lead levels as low as 41 ug/100g. [] A group of workers with a mean blood-lead level of 74.5 ug/100g showed

[2] The OSHA record contains substantial evidence to show that its goal of 40ug/100g—the same level which it presents as a feasible and necessary one to prevent the other health effects of lead—can in fact protect women from reproductive harm, and, moreover, that men require similar protection. *International Union, UAW* v. *Johnson Controls, Inc.* (7th Cir. 1989) 886 F.2d 871, discussed *infra,* simply ignores the evidence relied upon by OSHA.

significantly elevated teratospermia; of this group, three-fourths suffered hypofertility and half were in fact infertile. Another group with a mean blood level of 52.8 ug/100g showed hypospermia and asthenospermia, as did another group with a mean of 41 ug/100g. Dr. Lancranjan's work found some confirmation in a Mt. Sinai survey of 153 lead smelter workers, which revealed unusually high rates of fetal and newborn mortality in the children of these men. [] Older studies found alarmingly high rates of spontaneous abortion, miscarriage, stillbirth, and birth defects in the pregnancies of women *married to lead-exposed workers.* [] Other studies found serious chromosomal abnormalities among lead-exposed workers." (*Id.* at p. 1257, italics added.)

The Commission had before it not only the OSHA findings, evidence and conclusions, but also the evidence from expert witnesses both on behalf of the Company and on behalf of the Commission and Foster. The Company's expert (Dr. Noren) opined recent studies had not been done as to the effect of lead in males workers' reproduction systems. But he also stated there was as great a likelihood of discovering harm to male lead workers' offspring, *if* studied. Dr. Noren cavalierly characterized the situation this way: "If you don't look for a problem, you don't find it." Dr. Noren testified that old studies did link lead exposure in male lead workers with a high death rate among offspring in the first year of life. *Dr. Noren further testified that the only studies that showed brain damage in offspring of female lead workers resulted at blood-lead levels in the 50-70ug/100ml range, much higher than those of the Company's facility.* No similar studies were conducted on male workers.

This banning of fertile women only from employment was in the face of the foregoing evidence (and/or claimed lack of evidence). The Company's experts produced no information as to any studies which would justify the FPP exclusion of fertile females *only.* All of the experts disclosed through their testimony that the Company's policy is based on speculation (extrapolations) about the fetus and lead exposure,[3] assumptions that lack sound scientific support.

---

[3] The Company's experts were unable to identify or quantify the harm the FPP was supposed to remedy. The Company's expert Dr. Culver admitted there were no recent studies that showed birth defects from lead exposure of a mother. Dr. Charles Fishburn, the Company's final expert witness, was contradictory on this issue. Dr. Fishburn testified he had seen 30,000 to 50,000 lead exposed individuals in his professional life, and had seen thousands of battery workers. Yet he could think of only one instance where he felt that the offspring of a woman lead worker was suffering birth defects. On cross-examination, Dr. Fishburn remembered, after being shown his deposition testimony, that the child had continued to be exposed to lead after its birth, that the birth defect was hyperactivity and that there was no follow-up to determine if there were any "permanent effects" after the child was removed from lead ex-

The Commission's expert, Dr. Hector P. Blefer, testified to this paucity of any evidence beyond anecdotal material and extrapolated conclusions and studies made "earlier in the century" using 1910-1914 data. The difficulty with these earlier studies was that the investigators *did not* have a "blood level technique." These investigations were based upon Dickensian horror stories. ("People fully leaded." "They were in palsey." "We're talking about disastrous exposure and abhorrent conditions.")

## V

That lead in the blood is dangerous no one doubts. However, experts dispute how much is too much and whether lead is more risky to the fetus and developing infants than to adults.[4] Whether lead in a mother's blood, *at levels to which the Company exposes its employees,* endangers the fetus is a subject on which there is dispute, as well a total lack of evidence of harm to any fetus in the Company's experience. Showing great injury at 100ug/dl is not questioned; showing risks when no one has levels over 50ug/dl (per OSHA's rules) and below 30ug/dl (per the Company's rules) is another. The medical evidence does not quantify the risks at the levels OSHA permits.

The medical evidence does not reveal when and to what extent lead crosses the placenta. The Company's chief medical consultant, Dr. Fishburn, believes that risk is greatest in the first weeks of pregnancy, before women can withdraw to lead-free environments. Other experts take the contrary view and conclude lead does not cross the placenta until late in pregnancy; because lead levels in the blood fall substantially within 12 weeks of the last exposure, the danger is reduced if women are removed from contact with lead promptly on becoming pregnant.[5]

posure. Dr. Fishburn also admitted that because of individual variation, using solely a blood-lead level as a standard was inadequate to determine harmful effects on the body and that other tests as well as the history of the person should be taken into account.

[4] For a review of the evidence, see William L. Marcus & C. Richard Cothern, *The Characteristics of an Adverse Effect: Using the Example of Developing a Standard for Lead* (1985-1986) 16(4) Drug Metabolism Reviews 423. Dr. Michael Silverstein, a board certified specialist in occupational medicine, testified in a deposition that the risks of a given level of lead in the blood are no greater to the fetus and children than to adults. He supported this position with an affidavit to which he attached three scientific studies. Dr. Marvin S. Legator, director of the division of environmental toxicology at the University of Texas, gave a deposition agreeing with this view, as did Dr. Ellen Silbergeld, a senior scientist in the toxic program of the Environmental Defense Fund.

[5] Dr. Julian Chisolm, director of the lead program at the John F. Kennedy Institute in Baltimore, one of the Company's witnesses (*International Union, UAW* v. *Johnson Controls, supra,* 886 F.2d 871), testified in a deposition that lead does not cross the placenta until late in

The foregoing evidence and evidentiary paucity supports the factual conclusion that the exclusion of fertile women only from the battery factory workplace is a facial, blatant, overt gender-based job discrimination violative of Government Code section 12940, unless warranted by a BFOQ.

## VI

The trial court ruled the Commission erred as a matter of law in failing to consider the business necessity defense (BND) as set forth in *Hayes* v. *Shelby Memorial Hosp., supra,* 726 F.2d 1543, 1552-1553. The Company argues here the Commission erred in "rejecting the approval of the Federal court in their recognition of the defenses available against a claim of sex discrimination." The Company also cites California Administrative Code [now California Code of Regulations], title 2, section 7285.1: The effect of federal law "shall be considered [in interpreting the Fair Employment and Housing Act] to the extent practical and appropriate."

There is no statutory or case law requirement that the Commission, in construing California's statute, follow federal precedent construing title VII of the Civil Rights Act of 1964. California's FEHA and title VII are similar in some respects but differ in others. (See *Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 216-217 [185 Cal.Rptr. 270, 649 P.2d 912]; *Price* v. *Civil Service Com.* (1980) 26 Cal.3d 257, 276 [161 Cal.Rptr. 475, 604 P.2d 1365]; cf. *Ibarbia* v. *Regents of University of California* (1987) 191 Cal.App.3d 1318, 1326-1328 [237 Cal.Rptr. 92].) *The Legislature has expressly left to the Commission the duty to interpret the provisions of the FEHA, and has not qualified its authority by requiring adherence to federal precedent.* (Compare, Lab. Code, § 1148.)

In *DEFH* v. *Church's Fried Chicken, Inc.* (1987) FEHC Dec. No. 87-18 [1986-1987 CEB Precedential Decisions 8], the Commission said, "[W]e do

---

the pregnancy and that the adverse effect of lead in a mother's blood does not begin until the last half of the third trimester. Dr. Silbergeld took a similar view.

According to National Research Council Committee on Lead in the Human Environment 59-60 (1980), almost all lead stored in the body outside of bones is eliminated within four to six weeks of exposure. Dr. Silbergeld used the higher figure of 100 days for the elimination of lead from blood and soft tissues. Lead is released from bones much more slowly, but lead 207, the most common form they contain, is less active biologically. (National Research Council on Biologic Effects of Atmospheric Pollutants 68 (1979).) Even persons who have no occupational exposure ingest or inhale lead from other sources (paint, leaded gasoline, etc.), so that the actual blood-lead level may drop slowly; these sources of lead threaten an offspring whether or not the mother works in the Company plants. It is possible that lead builds up in the placenta during early pregnancy, while the mother's blood-lead level is highest but the quantum and extent of this effect, if there is such a buildup, is unknown.

give careful consideration to Title VII precedent, and we follow it where we are persuaded that it is practical and appropriate as a guide for interpretation of the FEH Act. [Citations.] Where Title VII precedent does not appear sound, however, or would conflict with the essential purposes of the Act, we may not and do not rely on it." (*Id.* at p. 12.) There is, accordingly, no authority for the trial court's ruling that the Commission, in construing the California statute, is bound, as a matter of law, to consider or follow federal precedent construing title VII.[6]

## VII

■ The Company argues the Commission breached its legal duty in failing to consider its BND. The Company makes this contention in face of the California statute limiting the defense allowable to overt discrimination against women who are of childbearing capacity to a BFOQ.

The Fair Employment and Housing Act provides that a discriminatory employment practice is *not* unlawful *if it is based upon a BFOQ*. The significance of this contention is to be found in a comparison of the nature of and burden of proof imposed by the BFOQ and the BND respectively. The two defenses have distinct conceptual bases. (See, e.g., *Hayes* v. *Shelby Memorial Hosp., supra*, 726 F.2d 1543, 1547; Schlei & Grossman, Employment Discrimination Law (1983) pp. 358-360.)

■ The BFOQ defense, as required by the statute, when applied to justify overt disparate treatment, has two components: First, the employer must demonstrate that the occupational qualification is "reasonably necessary to the normal operation of [the] particular business." Secondly, the employer must show that the *categorical* exclusion based on protected class characteristic is justified, i.e., that "all or substantially all" of the persons with the subject class characteristic fail to satisfy the occupational qualification. (*Weeks* v. *Southern Bell Telephone & Telegraph Company* (5th Cir. 1969) 408 F.2d 228; see also *Bohemian Club* v. *Fair Employment & Housing Com.* (1986) 187 Cal.App.3d 1, 19 [231 Cal.Rptr. 769].) In effect, the employer must establish that the class characteristic is a "proxy" for lack of the necessary occupational qualification. (*Western Air Lines, Inc.* v. *Criswell* (1985) 472 U.S. 400, 412-417 [86 L.Ed.2d 321, 332-335, 105 S.Ct. 2743].)

---

[6] As demonstrated *infra,* there is an unresolved dilemma as to what is the "federal precedent" the Commission was supposed to follow. There are three decisions by two of the twelve federal circuits, each of which took different approaches in analyzing the issue. Each case manifested great legal skill in refusing to enforce the plain language of title VII.

██ The availability of a BFOQ defense is "an extremely narrow exception to the general prohibition of discrimination on the basis of sex." (*Dothard* v. *Rawlinson* (1977) 433 U.S. 321, 334 [53 L.Ed.2d 786, 800, 97 S.Ct. 2720]; see also *County of Alameda* v. *Fair Employment & Housing Com.* (1984) 153 Cal.App.3d 499, 506 [200 Cal.Rptr. 381]; *Long* v. *State Personnel Bd.* (1974) 41 Cal.App.3d 1000, 1016 [116 Cal.Rptr. 562].) Hence, "the principle of nondiscrimination requires . . . that in order to rely on the bona fide occupational qualification exception an employer has the burden of proving that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved." (*Weeks* v. *Southern Bell Telephone & Telegraph Company, supra*, 408 F.2d 228, 235; see also *Usery* v. *Tamiami Trail Tours, Inc.* (5th Cir. 1976) 531 F.2d 224, 228.) Even if an employer can demonstrate that certain jobs require members of one sex, the employer must also "bear the burden of proving that because of the nature of the operation of the business they could not rearrange job responsibilities . . . ." in order to reduce the BFOQ necessity. (*Hardin* v. *Stynchcomb* (11th Cir. 1982) 691 F.2d 1364, 1370-1371; see also *Gunther* v. *Iowa State Men's Reform* (8th Cir. 1980) 612 F.2d 1079, 1085-1086, cert. den. (1980) 446 U.S. 966 [64 L.Ed.2d 825, 100 S.Ct. 2942].)

██ In contrast, the BND is to be applied in connection with *facially neutral practices that have a demonstrably disproportionate and adverse impact on members of a protected class*. To constitute a BND, an employment practice with disproportionately adverse impact "must be shown to be necessary to safe and efficient job performance . . . ." (*Dothard* v. *Rawlinson, supra*, 433 U.S. at pp. 331-332, fn. 14 [53 L.Ed.2d at p. 799].) The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any gender impact.

The BND is concerned with facially neutral rules, standards, and criteria, rather than with class-based exclusion. It is conceivable that a business justification which would not suffice as a BFOQ for class-based disparate treatment might, nevertheless, suffice under the "adverse impact/business necessity" standard.[7]

---

[7]Even that theoretical possibility vanishes when at issue is not a rule, standard, or criterion which *might* disproportionately exclude members of a protected class, but rather a determinative, if conceptually "neutral," trait or condition, such as pregnancy, or a possibility of pregnancy, which, if it excludes anyone, can only exclude members of a protected class. In such a case, it is pure sophistry to argue there is any distinction between an "adverse impact"

## VIII

 The Company has failed before the Commission to establish a factual basis for applying a BFOQ defense. The facts do not satisfy the BFOQ test. There is no evidence that fertile women cannot efficiently perform jobs involving contact with lead at the Company's facilities. Although *some* women have become pregnant while working there, thus creating the *possibility* of harm to their offspring, this fact falls far short of a showing that "all or substantially all" female workers create such a risk. Significantly, there was no evidence of any harm to a single child.[8] ██ ██ ██ ██ ██ The "essence" of the business operation—making automotive batteries—would not be undermined.[9]

In analyzing the BFOQ defense, the Commission ruled that "we are extremely sensitive to the implications of this risk, whatever its extent, that risks of this kind are best left to other entities to avert, and cannot support a BFOQ defense under the Act." The Commission continued, stating, "[T]here were additional factual problems with applying the BFOQ defense in this case." First, the Commission observed that, "[T]here is some evidence in the record of potential risk to the fetuses and offspring of *male,* as well as female workers, who are exposed to lead, particularly at the level of lead exposure required by the [COS] loader job. Where men share the same risk as women, obviously that risk cannot justify a rule that excludes no fertile men and all fertile women." The Commission further ruled, "[R]espondent must still meet the second part of the BFOQ test and convince us that the essence of its business—making lead acid batteries—would be undermined by the employment of fertile women in these production jobs." Thus, the Commission clearly stated that the BFOQ defense was not factually available to the Company. This is true, regardless of whether the BFOQ defense does or does not apply to the safety of third persons.

on the class (women) and "disparate treatment" of that class. The neutral trait or condition is but a proxy for membership in the protected class itself. This reasoning is confirmed by the judgment of the United States Congress when by legislation it overturned the *Gilbert-Satty* decisions.

[8] Thus, while there is a risk of harm, the risk itself was not shown to be substantial, as the law requires. By saying this, we do not adopt a cavalier attitude toward the "potential" youth of our nation, a precious national resource. One could justifiably take the position that the risk of even one handicapped child is too much to countenance. We simply decline to engage in judicial engineering in an area clearly within the province of the Legislature.

[9] We adopt the plain meaning of "essence" as used in the test: "[T]he most significant element, attribute, quality, property or aspect of a thing." (Webster's New Internat. Dict. (3d ed. 1981) p. 777.) Using this definition, the only possible scenario where the essence of the business would be undermined would be where unsafe practices unique to a group protected by Government Code section 12940 threatened the existence of the Company's battery business.

The Company argues its policies are consistent with traditional BFOQ analysis reasoning. "[A] female capable of bearing children cannot perform a job in a high lead environment without endangering the safety of her future children." However, the Commission, in Finding of Fact No. 12, stated, "[T]he preamble to the federal OSHA lead standard and its attachments both state that male and females exposed to lead *who wish to plan pregnancies should keep their blood lead levels below 30ug/100ml because of possible adverse effects to the fetus.*" The OSHA preamble specifically states that "there is no basis in the record for preferential hiring of men over women in the lead standard, nor will this final standard create a basis for exclusion from work of any person, *male or female, who is capable of procreating.*"

## IX

■■■ The Company cites federal authority holding that FPP's are subject to a special analysis using the BND rather than the BFOQ test. (*International Union, UAW* v. *Johnson Controls, Inc., supra,* 886 F.2d 871; *Hayes* v. *Shelby Memorial Hosp., supra,* 726 F.2d 1543; *Wright* v. *Olin Corp.* (4th Cir. 1982) 697 F.2d 1172.) ■■■ Although "the 'antidiscriminatory objectives' and 'overriding public policy purposes' of title VII [of the Civil Rights Act of 1964] and California's Fair Employment & Housing Act are identical" (*City and County of San Francisco* v. *Fair Employment and Housing Com., supra,* 191 Cal.App.3d 976, 985) and should be used as an interpretive aid where appropriate (*Price* v. *Civil Service Com., supra,* 26 Cal.3d 257, 276; Cal. Code Regs., tit. 2, § 7285.1, subd. (b)), we decline to follow these cases for the reasons following.

■■■ *Wright* v. *Olin Corp., supra,* 697 F.2d 1172, was the first case to deal with the fetal protection issue. It considered the various alternative analyses in discrimination cases.[10] The court immediately dismissed the covert discrimination paradigm as inappropriate to the facts presented and opted for the disparate impact/business necessity theory over the overt

---

[10] Case law has developed three basic paradigms for discrimination cases. (*Hayes* v. *Shelby Memorial Hosp., supra,* 726 F.2d 1543, 1547.) The first is "overt" or "facial" discrimination, where an employer adopts a policy which explicitly treats some employees different from others on a prohibited basis such as gender. Such discrimination may be justified only by a BFOQ. The second variety involves a facially neutral policy which the employee claims is a "pretext" for discrimination. (*Id.* at p. 1547.) Since such "covert" discrimination, if proved, also involves disparate *treatment* of employees, it is subject to BFOQ justification. (*Wright* v. *Olin Corp., supra,* 697 F.2d 1172, 1183; but see Cal. Code Regs., tit. 2, § 7286.7, subd. (b).) The third paradigm occurs where a facially neutral policy yields a disparate *impact* upon the protected group. Such a policy is subject to the BND. (*Hayes, supra,* at p. 1547; see also Cal. Code Regs., tit. 2, § 7286.7.)

discrimination theory, although it acknowledged that both were "arguably" applicable. (*Id.* at p. 1185.)

The court reasoned in essence that the latter theory was unworkable because an employer could never meet the BFOQ standard in defending an FPP.[11] The court also opined that the policy was facially neutral, that any contention to the contrary would involve "mere semantic quibbling." (697 F.2d at p. 1186.)

We do more than quibble; we disagree. As demonstrated, the FPP applies only to women, both by its own terms and the realities of reproduction. Congress recognized as much when it enacted the Pregnancy Discrimination Act (42 U.S.C. § 2000e(k)) as did the Commission in adopting California Code of Regulations, title 2, section 7291.2, subdivision (d). (See Gov. Code, § 12935.) The fact that it may be difficult for the employer to meet the BFOQ standard in an FPP situation is a concern of the Legislature. This court should not misconstrue the plain import of the law to solve a problem the legislative branch would have addressed if it were omniscient.

Unlike the federal law (tit. VII) considered in *Wright* v. *Olin Corp., supra*, 697 F.2d 1172, the BFOQ defense is *expressly* denoted as the business justification standard to be used in overt discrimination cases. (Gov. Code, § 12940.) It is not for this court in a surge of unjustified judicial activism to create statutory exceptions where the Legislature has not, for whatever reason, done so itself. (*County of Los Angeles* v. *Frisbie* (1942) 19 Cal.2d 634, 644 [122 P.2d 526]; *People* v. *White* (1954) 122 Cal.App.2d 551, 554 [265 P.2d 115]; compare *Wright* v. *Olin Corp., supra*, 697 F.2d 1172, 1188 [where the circuit court said its task is to "divine probable congressional intention" re FPP's].)

In *Hayes* v. *Shelby Memorial Hosp., supra*, 726 F.2d 1543, an X-ray technician was fired upon becoming pregnant. The court recognized the Pregnancy Discrimination Act and "tend[ed] to agree that [it was] a facial discrimination case . . . ." (*Id.* at pp. 1546, 1548.) Nevertheless, the court applied the BND "to ensure complete fairness to the hospital . . . ." (*Id.* at p. 1548.)

The court accomplished this result by finding that the overt discrimination gave rise only to a presumption of discrimination. The employer could rebut it by showing: "(1) that there is a substantial risk of harm to the fetus or potential offspring of women employees from the women's exposure,

---

[11] This is not true; the employer could conceivably show that the FPP was necessary to the essence of the business.

either during pregnancy or while fertile, to toxic hazards in the workplace, and (2) that the hazard applies to fertile or pregnant women, *but not to men.*" (726 F.2d at p. 1548, fn. omitted, italics added.) Upon such a showing a BND analysis would apply, which, the court opined, the employer automatically met by making the initial two-prong rebuttal.

To the extent the first prong of the *Hayes* rebuttal showing mirrored a BFOQ, we adopt it here. However, the *Hayes* court's analysis belies such a premise. While the court required an objective showing of an unreasonable risk to the unborn, it did not insist upon a demonstration that the risk affected substantially all female employees to the point of threatening the essence of the business. (726 F.2d at p. 1550.) Moreover, the court's holding that the rebuttal showing also automatically satisfies the BND is further evidence of its intent to use that standard for the initial prong.

We decline to adopt the *Hayes* court approach. Like *Wright* v. *Olin Corp.*, *supra*, 697 F.2d 1172, it requires ignoring the plain language of the California statute. By adopting it, this court would champion an analysis which holds that overt, facial discrimination creates only a presumption of discrimination.

The *Wright* and *Hayes* courts failed to recognize that motive is irrelevant to and not an excuse for overt disparate treatment of women. Since the time of *Muller* v. *Oregon* (1908) 208 U.S. 412 [52 L.Ed. 551, 28 S.Ct. 324], legislation discriminatory to women has been justified by the assertedly benign or even laudable motives of the Legislature. However, that fact has not deterred modern courts from looking at the actual treatment occasioned by the practice and not the rationale behind it. (*Wengler* v. *Druggists Mutual Ins. Co.* (1980) 446 U.S. 142, 150 [64 L.Ed.2d 107, 115, 100 S.Ct. 1540]; *Griggs* v. *Duke Power Co.* (1971) 401 U.S. 424, 430-431 [28 L.Ed.2d 158, 163-164, 91 S.Ct. 849].)

In *International Union, UAW* v. *Johnson Controls, Inc., supra,* 886 F.2d 871, the Seventh Circuit considered the very FPP at issue here. In purporting to follow the *Olin* and *Hayes* analyses, the court found the policy met the BND standard. (*Id.* at pp. 887-893.) It further found that the policy satisfied the more rigorous BFOQ analysis. (*Id.* at p. 893.) In doing so, it adopted premises with which this court is substantially at odds. For example: How can the policy possibly be "essential" or "indispensable" to the Company's business? (*Id.* at p. 893.) Likewise it is irrelevant to a BFOQ analysis that an FPP excluding "only" fertile women affects fewer women than one excluding all women. (*Id.* at p. 893.) Such an approach twists the BFOQ standard by requiring all women must be actually excluded before

discrimination is found. *The definition of BFOQ requires "all or substantially all" women must pose a substantial risk to the employer's business before the defense is made out.*

The gist of the *International Union* court's BFOQ analysis rests upon the premise that Congress intended the defense to be a "recognition [of the] real physical differences between men and women. . . ." (886 F.2d at p. 895.) These differences, the argument runs, justify disparate treatment. (*Id.* at p. 895.) Even if the validity of this argument were assumed,[12] how does it lead to the conclusion that industrial safety is the "essence" of a business (at least where it does not threaten the very existence of the business) or that the employer need only show the BFOQ is "reasonably necessary" to further the objective of safety? (*Id.* at p. 896.)[13]

Whatever Congress's intent in enacting title VII, the plain language of the California Fair Employment and Housing Act mandates a finding that women—whether "limited" to fertile women or not—may only face employment discrimination where it is necessary for the very operation of the business. Common sense supports this conclusion. It is indisputable that discrimination in the workplace presents a pervasive problem to our society. The Legislature deemed it of sufficient importance to enact comprehensive legislation and create the Commission to implement it. This fact, taken together with the definition of BFOQ, implies an intent to leave such issues as the safety of fetuses and other potential offspring to care of their parents and, if need be, to the Legislature.

## X

We are not alone in casting a disapproving eye on *International Union, UAW* v. *Johnson Controls, supra,* 886 F.2d 871, and its *Hayes* and *Wright* antecedents. This decision has been recently reviewed and sharply criticized by the federal Equal Employment Opportunity Commission in the policy guidance rules issued by that administrative body. (N-915-047, Jan. 24, 1990.)

---

[12] We note this largely male-created rationale has grown ever less fashionable and acceptable in the latter half of the 20th century.

[13] It is interesting to note the record in *International Union* reveals that from 1979 through 1983, only six Company employees subject to its *voluntary* fetal pregnancy policy (presumably nationwide) became pregnant. Of those, one had a child who later recorded an elevated blood-lead level. A connection between lead ingestion by the mother in the workplace and the fetal elevations impact was not established. Although there were no percentages given, it is hard to believe that these women demonstrated a *significant* risk to the offspring of the work force. The unavoidable conclusion is the *International Union* court found that a perfectly safe work environment was necessary to the essence of the Company's business.

The Commission concluded, "*Commission field offices should not rely on the Johnson Controls decision as guidance for processing 'fetal hazards' charges.*" The Commission reasoned, "Employment policies that exclude women on the basis of pregnancy or capacity to become pregnant are discriminatory on their face and employer justifications for such policies must be examined critically. The majority in *Johnson Controls* gave undue deference to the employer's judgment in broadly drawing its exclusionary policy. The court stated that this deference was '[ ] due to the "unique" nature of [the Company's] business and the "difficult societal problem" that the policy was designed to address.' 51 EPD at 59,487. As further support, the court twice quoted the Supreme Court's statement in *Wards Cove* [*Packing Co.* v. *Atonio* (1989) 490 U.S. 642 (104 L.Ed.2d 733, 109 S.Ct. 2115)], that '[c]ourts are generally less competent than employers to restructure business practices . . . [and] consequently, the judiciary should proceed with care before mandating that an employer must adopt [an alternative employment practice] in response to a Title VII suit.' *Id.* at 59,487 and 59,491, quoting *Wards Cove,* 109 S.Ct. at 2127. However, the Supreme Court's statement was made in the context of an adverse impact *challenge to neutral job* [ ] *practices. Such deference is not required when the practice that is challenged is facially discriminatory.*" (N-915-047, Jan. 24, 1990, fn. omitted, italics added.)

In support of this refusal to follow *International Union, UAW* v. *Johnson Controls, supra*, 886 F.2d 871, the Commission explained: "In applying the BFOQ defense to these cases, we caution that the defense is written and should be read narrowly. See 51 EPD at 59,493. [ ] It imposes a threshold requirement that the employer must state a reasonably necessary business objective for its fetal protection policy. While Judge Easterbrook does not think fetal protection has anything to do with [the Company's] ability to make batteries, *id.* at 59,593, Judge Posner concludes that the 'normal operation' of a business can incorporate the employer's legitimate concerns for the safety of others. As he said, 'It is possible to make batteries without considering the possible consequences for people who might be injured in the manufacturing process, just as it would be possible to make batteries with slave laborers, but neither mode of operation would be normal.' 51 EPD at 59,493. Therefore, the Commission concurs with Judge Cudahy's [dissenting] observation that the employer 'may permissibly consider the possible risks to (even potential) third parties in the normal course of business decision making.' 51 EPD at 59,492, n. 1." (N-915-047, Jan. 24, 1990.)

The Commission further concluded, "The employer must show that protection of third parties from risk is 'reasonably necessary to the normal operation of the particular business.' One cannot merely assume, for purposes of analysis of a Title VII discrimination claim, that containment of

any hazard, however improbable or inconsequential, is 'reasonably necessary' to that business's 'normal operation'—this must be proven. To prove that such a practice is reasonably necessary the employer must demonstrate that it takes reasonable steps to identify and appropriately shield all persons from the hazard against which it purports to protect the excluded group. *Most obviously, where an employer has excluded pregnant or potentially pregnant women on the basis of a perceived risk to the fetus, it must show that it similarly protects offspring of its male employees from the same or analogous risks. In addition, it must show that it attempts to protect others from the same hazard.* [Italics added.] Containment of a particular hazard, such as lead, can hardly be reasonably necessary to its normal operations if the employer carelessly exposes everybody to that hazard except potential offspring of female employees.

"If the employer establishes that protecting others from the particular hazard is part of its normal business operations, it must then establish that its exclusionary policy is reasonably necessary to further that interest. . . .

"In a BFOQ defense of a fetal protection policy excluding women workers, the employer must prove that there is a substantial risk of harm to offspring through occupational exposure of potential parents to the hazard identified. Next, if it applies its protective policy only to women, it must prove that the risk is transmitted only through pregnant women and that it has a factual basis for believing that all or substantially all of the excluded group cannot perform the job without jeopardizing the safety of the group's offspring. (See *Johnson Controls,* 51 EPD at 59,492 n. 1 [], citing *Weeks* v. *Southern Bell Tel. & Tel. Co.*, 408 F.2d 228, 235 (5th Cir. 1969).) In other words, the employer must prove that the policy it has adopted to reduce risk is narrowly tailored; if it excludes all fertile women when the risk is only through pregnant women and there are reasonable steps which can be taken to reduce or eliminate, as necessary, the exposure of pregnant women, the exclusionary policy cannot be said to be 'reasonably necessary'. Similarly, if there are reasonable ways to test for safe levels of the hazard, as is true in the case of radiation and lead exposure, the employer that does not use such tests to minimize the extent of the exclusion will not meet its BFOQ obligations." (N-915-047, Jan. 24, 1990.)

Concerning the BFOQ defense, the Commission adopted these long-standing rules: "In short, whether one applies the BFOQ or the 'business necessity' analysis as discussed in the fetal hazard policy guidance, the burden is on the employer to justify its policy. The pertinent questions are: 1) whether there exists a substantial risk of harm to offspring through workplace exposure to a hazard; 2) whether that risk takes place only

through the exposure of one sex; 3) whether the policy minimizes the risk while excluding the narrowest possible group; and 4) whether there are reasonable alternatives which are less onerous to women. *See* Fetal Hazard Policy Guidance, nn. 14-17 and accompanying text." (N-915-047, Jan. 24, 1990, fn. omitted.)

Criticizing *International Union, UAW* v. *Johnson Controls, supra,* 886 F.2d 871, the Commission stated for guidance of its field representatives: "*Commission investigators should not overlook or dismiss conflicting evidence on the basis of the Seventh Circuit decision.* Although the majority was satisfied that substantial risk to the fetus was established, Judge Easterbrook stated that there was a dispute as to the extent to which the level of lead to which [the Company] exposes its employees would endanger a fetus. *Id.* at 59,503. He also observed that the risk of harm to a fetus should also include the risk of inferior prenatal care resulting from removing women from or denying them access to well-paying jobs with attendant health insurance. *Id.* at 59,505." (N-915-047, Jan. 24, 1990, italics added.)

The Commission pointed out these further factual errors and omissions stating: "The majority in *Johnson Controls* rejected UAW's animal research evidence, stating that it was 'speculative,' 'unconvincing' and not 'solid scientific data.' *Id.* at 59,481. *See* no. 3, above. Commission investigators should not reject animal studies in such a wholesale manner. 51 EPD at 59,506 [] ('The medical profession . . . will be stunned to discover that animal studies are too "speculative", slip op. 33, to be the basis of conclusions about risks'). These studies may in some cases provide the best available evidence to evaluate fetal or other human health hazards in the workplace." (N-915-047, Jan. 24, 1990.)

Finally concerning the ignoring of OSHA findings, the Commission said: "Also significant to the issue of harm mediated through both sexes, is OSHA's finding that lead in men, as well as women, is hazardous to the unborn and its conclusion that exclusion of only women is not the proper solution. *The majority failed even to acknowledge this aspect of OSHA's findings. See id.* at 59,505, citing 43 Fed. Reg. 52953, 52966 (1978) and 29 C.F.R. Part 1910, pp. 833-34 (1987). Commission investigators, in contrast, should defer to pertinent conclusions by appropriate government agencies. *See* n. 16 and accompanying text." (N-915-047, Jan. 24, 1990, italics added.)

We concur with the federal Equal Employment Opportunity Commission in its reasoned refusal to follow the *International Union, UAW* v. *Johnson Controls* decision.

## CONCLUSIONS

## XI

The Company asks this court to ignore the Commission's decision and to set state policy itself, exempting its FPP under any theory "[w]hether labeled as business necessity, BFOQ, or both." The Company suggests this court adopt the discredited logic of the Supreme Court in *General Electric Co.* v. *Gilbert, supra*, 429 U.S. 125 and *Nashville Gas Co.* v. *Satty, supra*, 434 U.S. 136, arguing that " '[t]raditional' sex discrimination legal analysis has *always* recognized that where there is an *objective, factual* basis to distinguish between men and women in the workplace, an employer may treat the sexes differently."

But the Company's FPP does not discriminate on the basis of "objective differences" between men and women; it discriminates on the basis of unfounded, unscientific stereotypic notions of women. That women are biologically capable of becoming pregnant is concededly a difference between men and women, yet that is not the basis of the Company's discriminatory policy. The Company's policy is to exclude women, not because they are *pregnant,* but because they are *fertile.*[14]

From the perspective of fetal protection, *until* a fertile woman becomes pregnant, she stands in precisely the same position as a fertile man; in either case, the danger to unborn offspring is nonexistent, or, at least, identical (assuming as evidence suggests there may be some danger of injury to reproductive cells posed by exposure to lead compounds). It is not the abstract biological fact that women are *capable* of becoming pregnant which supposedly requires the exclusion of women, but rather the chance that they will *become* pregnant—a factor speaking more about the ability of women to control their lives and their bodies than about biological distinctions.

By excluding all women solely on the basis of fertility, the Company makes at least the following unfounded assumptions about women—*none of*

---

[14] Contrary to the Company's assertion, the Commission has *not* "held as a matter of law that all fetal protection policies are unlawful and that neither the business justification defense nor the bona fide occupational qualification defense could ever apply to such policies . . . ." The Commission has held only that the Company's fetal protection policy, which categorically excludes all fertile women, is unlawful. The Commission has not considered a fetal protection policy which excludes women from hazardous jobs based on pregnancy in fact. Furthermore, the Commission observed that "respondent's 1977 voluntary fetal protection program appears to represent a sound and proper response to this problem under the FEHA, in that it educated women as to the risks involved and then left them free to make their own decisions."

*which* has anything whatsoever to do with "objective differences" between men and women: (1) that all unmarried fertile women are either presently actively involved in sexual relationships with men, or will definitely become so involved; (2) that fertile women who are actively involved in sexual relationships with men or who may become so involved, are or will be involved with a fertile man (a woman's partner, for example, might have had a vasectomy); (3) that fertile women who are actively involved in sexual relationships with a fertile man, or will become so, cannot be trusted to employ reasonably adequate prophylactic measures against an unexpected pregnancy; and (4) that fertile women, even when possessed of sufficient information about the worksite hazard, are incapable of properly weighing the chances of unexpected pregnancy, notwithstanding use of prophylactic measures, against the possibility of fetal hazard should she become pregnant.[15]

The Company's policy is predicated upon the presumption that the employer is better suited to safeguard the interests of a woman's future offspring, should there be an unexpected pregnancy, than is the woman herself—i.e., that society's interest in fetal safety is best served, not by fully informing women of the risks involved and allowing them to make informed choices, not by fixing the workplace, but rather by removing from women the opportunity to make any choices in the matter at all.

Distilled to its essence, this is not discrimination based on "objective differences" between men and women, it is discrimination based on categorical, long ago discarded assumptions about the ability of women to govern their sexuality and about the comparative ability of women to make reasoned, informed choices.

However laudable the concern by businesses such as the Company for the safety of the unborn, they may not effectuate their goals in that regard at the expense of a woman's ability to obtain work for which she is otherwise qualified.[16]

---

[15] We would suggest that women may or may not want children, may or may not be bound by an oath to strict chastity, or may or may not have sexual preferences that do not include males or the possibility of pregnancy. We are in an era of *choice.* A woman is not required to be a Victorian brood mare. She may, with constitutional basis, prefer not to have children.

Had the job seeker in this case been a fertile *nun,* the Company's purported justification for excluding her from the job—fetal protection—would manifestly be far from persuasive. Such an example points to this conclusion. The Company's concern would be less with biological differences and more with the possibility the woman would violate her vow of celibacy.

[16] The dissent in *International Union, UAW* v. *Johnson Controls, Inc., supra*, 886 F.2d 871 cogently pointed out that the health risks of children associated with unemployed parents (e.g., health care and nutrition) may equal or exceed those arising from lead exposure. (*Id.* at p. 918.)

Nothing in law or reason mandated the Commission to depart from settled principles of discrimination law in order to excuse the Company's categorical discrimination. Exceptions to the statutory mandate are limited to those situations where the danger to the existence of the business justifies allowing the discriminatory practice. The Commission's findings are factually supported. Its decision and order were legally correct.

The judgment is reversed.

Crosby, Acting P. J., and Sonenshine, J., concurred.

A petition for a rehearing was denied March 27, 1990, and the opinion was modified to read as printed above. The petition of plaintiff and respondent for review by the Supreme Court was denied May 17, 1990.