[No. C044087. Third Dist. Aug. 25, 2004.]

AUBURN WOODS I HOMEOWNERS ASSOCIATION et al., Plaintiffs and Respondents, v.
FAIR EMPLOYMENT AND HOUSING COMMISSION, Defendant and Appellant;
ABDELFATAH ELEBIARI et al., Real Parties in Interest and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION[*]]**

---

[*]Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I and III.

1580

COUNSEL

Bill Lockyer, Attorney General, Richard M. Frank and Will Brieger, Chief Assistant Attorneys General, Louis Verdugo, Jr., Assistant Attorney General, Suzanne M. Ambrose and Timothy M. Muscat, Deputy Attorneys General, for Defendant and Appellant.

Jay-Allen Eisen Law Corporation, Jay-Allen Eisen, C. Athena Roussos and Stephen E. Goldberg for Real Parties in Interest and Appellants.

Michael W. Thomas and Trainor Robertson for Plaintiffs and Respondents.

OPINION

**HULL, J.**—Under the California Fair Employment and Housing Act (FEHA) (Gov. Code § 12900 et seq.; subsequent unspecified statutory references are to the Government Code), it is an unlawful practice to refuse "to make reasonable accommodations in rules, policies, practices, or services when these accommodations may be necessary to afford a disabled person equal opportunity to use and enjoy a dwelling." (§§ 12927, subd. (c)(1), 12955.)

In this case, real parties in interest Jayne and Abdelfatah "Ed" Elebiari sought permission from their condominium development and condominium association, Auburn Woods I Homeowners Association and Auburn Woods I Condominium Development (jointly referred to as Auburn Woods), to keep a small dog. The Elebiaris suffer from severe depression and found that taking care of a dog alleviated their symptoms and enabled them to function more productively. The association refused their request, leading the Elebiaris to file a claim with the Fair Employment and Housing Commission (the FEHC or the Commission), which found in favor of the Elebiaris. Auburn Woods then filed a petition for administrative writ of mandate (Code Civ. Proc., § 1094.5) to overturn the FEHC decision, and the trial court granted the requested relief.

The Elebiaris and the FEHC appeal asserting the FEHC decision was supported by substantial evidence and should not have been disturbed. We agree, and therefore reverse the judgment.

STANDARD OF REVIEW

The relevant standard of review is particularly important to keep in mind in this appeal.

"In reviewing the validity of the Commission's decision, Code of Civil Procedure section 1094.5 requires, in relevant part, that this court inquire into whether the Commission acted in excess of its jurisdiction and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the Commission failed to proceed in the manner required by law or its finding of discrimination is not supported by substantial evidence in light of the whole record." (*County of Fresno v. Fair Employment & Housing Com.* (1991) 226 Cal.App.3d 1541, 1548 [277 Cal.Rptr. 557].)

"On appeal, this court exercises the same function as the trial court and must decide if the [Commission's] findings were based on substantial evidence. Neither court may reweigh the evidence, and both courts must view the evidence in the light most favorable to the Commission's findings and indulge in all reasonable inferences in support thereof. [Citations.]

"This court's duty is to review the findings and actions of the Commission 'and not the findings of the trial court.' [Citation.] To that end, this court must review the entire record to determine whether the Commission's findings and decision are supported by substantial evidence. [Citations.]

" 'We may not isolate only the evidence which supports the administrative finding and disregard other relevant evidence in the record. [Citations.] On the other hand, neither we nor the trial court may disregard or overturn the Commission's finding " 'for the reason that it is considered that a contrary finding would have been equally or more reasonable.' " [Citations.] . . .' [Citation.] [¶] . . . [¶]

"This court must uphold the Commission's decision unless the review of the entire record shows it is so lacking in evidentiary support as to render the decision unreasonable. [Citation.]

"Substantial evidence is defined as: ' "relevant evidence that a reasonable mind might accept as adequate to support a conclusion, . . ." ' [Citation] or evidence of ' " 'ponderable legal significance . . . reasonable in nature, credible, and of solid value.' " ' [Citation.]

"While the Commission's findings on questions of fact will be sustained if supported by substantial evidence on the record considered as a whole, yet, if

the Commission committed any errors of law, the trial and appellate courts perform 'essentially the same function' and are not bound by the Commission's legal conclusions." (*Johnson Controls, Inc. v. Fair Employment & Housing Com.* (1990) 218 Cal.App.3d 517, 531–532 [267 Cal.Rptr. 158] (*Johnson Controls*).)

FACTS AND PROCEEDINGS

Ed Elebiari was involved in a serious car accident in 1991 and suffered brain damage that required three surgeries. He is hydrocephalic, has a seizure disorder, has severe headaches, and suffers from depression. At times he feels so debilitated that he feels he is "just barely staying alive day by day." His psychiatrist, Dr. Schnitzler, diagnosed him as having bipolar disorder, obsessive-compulsive personality disorder, and seizure disorder. Dr. Schnitzler considered Ed to be permanently disabled and incapable of working.

Ed's wife, Jayne, also suffered from depression. Dr. Schnitzler and Dr. Lasser, a psychologist, both diagnosed her condition as "major depression, recurrent," meaning that serious episodes of depression, lasting from nine months to one year, return as recurrent episodes. During these episodes, Jayne has sleeping problems, lacks concentration, engages in acts of self-mutilation, and avoids social interaction. Dr. Schnitzler believed Jayne would do fairly well if treated with medication, and thought she could continue working.

In 1998, the Elebiaris bought a condominium at Auburn Woods. Section 6.17 of the condominium's covenants, conditions and restrictions (CC&R's) provides: "No reptiles or animals shall be permitted in the Condominium Units or on the property except that pet birds and domestic house cats (limit of 2) shall be allowed so long as they do not constitute a nuisance to the neighbors and other residents. The Board of Directors has the discretion to adopt reasonable rules and regulations in regard to the keeping of these specifically enumerated pets so as to avoid nuisance problems or health and safety hazards. *No dogs are allowed to be kept anywhere in the development.*" (Italics added.)

Despite this ban on dogs, in April 1999, the Elebiaris brought home a small terrier named Pooky. Jayne believed the dog would help her and her husband with their depression. In fact, Jayne's agitation lessened, her concentration improved, her interpersonal relationships improved, she slept better, and the acts of self-mutilation became less severe. The dog also had a positive effect on Ed by keeping Ed occupied. Ed took the dog for walks and played with her. The dog alleviated depression for both Jayne and Ed, and enabled them

to enjoy each other's company more. Dr. Schnitzler believed that the Elebiaris' moods and affects improved after getting the dog.

On June 28, 1999, Mike Hancher, the director/property manager for Auburn Woods, sent the Elebiaris a formal letter warning that they were violating the CC&R's and could not keep a dog on the premises. Hancher told them that if the dog was not removed, fines would be imposed.

Because the Elebiaris could not afford the fines, they took their dog to a friend's home on July 1. Ed cried for three days afterward and had sleeping problems as well as increased anger and irritability. He stopped activities and "basically did nothing." Jayne's depression also returned and she became irritable. She stayed in bed rather than going to work, and the relationship between Jayne and Ed deteriorated.

In September 1999, Jayne asked Hancher for permission to keep the dog, telling him that Ed had a history of seizures. Hancher told her to submit medical verification to support her request.

Jayne submitted a letter to Auburn Woods on September 23, 1999, asking for "a reasonable accommodation to [her] impairment by waiving the prohibition against 'dogs.' " She stated that her symptoms had improved with the acquisition of a companion pet and had deteriorated when the dog was removed. She asked for the waiver of the no-dogs rule, stating: "I am [a] disabled person who works outside the home who needs the companionship of a dog to alleviate some of the adverse affects [*sic*] of my disability both at home and on the job. The alternative is additional stronger medications which would prohibit gainful employment."

If allowed to keep the dog, Jayne promised that she would "immediately dispose of any solid waste products produced [by] the dog; keep all barking to an absolute minimum at all times; and the dog will wear a lead at all times if she's within the common condo areas. Furthermore, she will not be allow[ed] in the laundry-room, pool area, or places where residents congregate."

Jayne attached a letter from Dr. Schnitzler, her treating psychiatrist, written on Kaiser Permanente letterhead and dated September 23, 1999. This letter stated: "Jayne Elebiari has been receiving psychiatric care since March of 1998. Jayne's emotional well-being improved after purchasing a companion dog. I recommend that reasonable accommodations in rules be made to allow Jayne to continue to have her companion animal."

Jayne submitted this request on her behalf without mentioning Ed because Ed was very sensitive about his medical history and Jayne did not want to upset him by publicizing his medical condition to others.

On September 27, 1999, Hancher left a message on the Elebiaris' answering machine in which he said he had received their letter. He laughed, and then said he was "a little confused" because Jayne had initially said that they had the dog "because Ed was having seizures . . . and now I'm looking at something totally different." Hancher said he would forward the letters to the Auburn Woods attorney, but added: "This letter here is not gonna be substantial enough, I can tell you that right now. He'll—we'll have to go to court on the thing and the doctor will have to testify and bring your records up. And also, uh, Ed's doctor will have to come in . . . but I'm gonna go ahead and forward it to our attorney and it's gonna be awhile, so make sure that during the interim, you don't have the dog there . . . . I'll have our attorney forward, uh, correspondence to you that she is in review and, uh, then the subpoenas will come out and we'll have to go and have your doctor testify. But, uh, uh, it doesn't look very good to me. So, (laugh) I just don't understand why you're doing this to tell you the truth. . . ."

In the meantime, Jayne solicited a letter to Auburn Woods from Michael Fletcher, who worked as an advocate for people with disabilities. This letter stated that both Jayne and Ed "have been prescribed a companion animal for medical reasons." Fletcher noted that Jayne had already submitted verification from her psychiatrist, and that verification for Ed would be sent after his October visit with his psychiatrist. Fletcher stated that the Elebiaris' "health and well being have been adversely affected by the association's refusal to allow them to keep their 11 lb. canine companion because they have a strong emotional bond with their canine companion causing them severe psychological harm and the small dog's presence in their home provides significant therapeutic benefits in terms of anxiety, stress, and pain relief and decreases the need for medication."

On October 12, Dr. Schnitzler and the Auburn Woods attorney, Beth Grimm, wrote letters that apparently crossed in the mail. Dr. Schnitzler wrote that Ed "has been permanently disabled since 1992. He has been receiving psychiatric care since August of 1998. His emotional well-being improved substantially with the purchase of a companion dog. I recommend that [Ed] be allowed to keep his companion dog."

Also on October 12, Grimm wrote to Dr. Schnitzler in response to the letter he had written about Jayne. Grimm asked Schnitzler to answer three questions: "1. Is there any reason to believe that a cat would not make just as good a companion as the dog you referenced in your letter? (The Association allows owners and residents to have a cat as a pet.) [¶] 2. Could you please

identify the condition of [*sic*] 'handicap' which falls within the definition of 42 U.S.C. Section 3604(c)? *Your letter is being used in support of a claim* that Mrs. Elebiari requires special accommodations (keeping the dog) in order to have equal opportunity to use or enjoy her dwelling. [¶] 3. Your letter is vague and does not establish the 'causal' relationship between getting the dog and the improvement in Mrs. Elebiari's condition. Are you prescribing the dog as being necessary or therapeutic or stating that obtaining the dog is the basis for improved mental state?"

Dr. Schnitzler did not know how to respond to Grimm's letter, so he did not reply. Grimm did not follow up with Dr. Schnitzler, even after receiving Schnitzler's second letter, in which he described Ed as permanently disabled and recommended that Ed be permitted to keep his dog.

The Elebiaris hired an attorney, S.L. Roullier, to handle their case. Roullier wrote to Grimm on October 14, 1999, outlining the basis for the Elebiaris' request. Roullier acknowledged that the Elebiaris were aware that the CC&R's did not permit dogs, but believed that a small dog would be allowed "because of the therapeutic value that they would derive from this house pet in alleviating the severe medical handicaps from which they both suffer. [The Association was not aware of these handicaps at the time of acquisition of the pet by the Elebiaris, but were so informed later]." The attorney then specified: "Ed Elebiari is handicapped by reason of Hydrocephalus, Manic Depression, Seizure Disorder, and is a recipient of SSDI benefits . . . Jayne Elebiari suffers from Clinical Depression, Hypertension, Diabetes and Arthritis, and as part of her treatment she has been medically advised to keep an in-house pet. . . . Further medical evidence of their conditions can be made available upon request." Roullier reiterated the Elebiaris' request to keep their pet "under any conditions specified," and he asked to speak to the Auburn Woods board directly.

On November 9, 1999, Grimm responded to Roullier by reiterating that the CC&R's permit cats but not dogs. Grimm stated that she had reviewed state and federal law, and concluded: "Although the law contemplates *reasonable* 'special accommodations' be made for the people with disabilities, the Elebiaris have asked for a special accommodation that is not acceptable in this situation. Residents in Auburn Woods . . . may have a companion animal, i.e. a cat. The Association stands by its original decision, which is to deny the request." Grimm reiterated that the Elebiaris knew of the ban on dogs when they bought the condominium, and stated that there had been complaints about the dog. She stated: "I believe the Association[']s decision is reason-

able. The Association will be entitled to initiate disciplinary action if necessary to prohibit the keeping of the dog." Grimm concluded by informing Roullier that she would pass on his request to address the Auburn Woods board.

Jayne Elebiari spoke to the board at its December 1, 1999 meeting. She said that she was allergic to cats and therefore a companion cat was not a feasible option. She explained that she had recurrent clinical depression and that Ed was disabled. Having a dog alleviated their depression. The Association stated that, "through its legal counsel, [it] has done some research and has continued their position that a 'companion pet' is not the issue. The issue is that the Association does not allow dogs." Hancher reiterated that this position had not changed.

The Elebiaris were very upset after this meeting. Roullier wrote to Grimm on December 2 to express concerns for the Elebiaris' health and he again asked to address the board. Roullier also advised that the Elebiaris would move from their condominium as a "last resort."

Grimm responded by stating that the board "has spent a considerable amount of time on this issue, and a considerable amount of money. . . . The Board . . . has determined that to date, a sufficient amount of time and investigation has been given to this issue to come to a reasonable determination. That determination is that the Association offers a reasonable accommodation to people who wish to have companion pets, and that is to allow them to have a cat." She stated a meeting might be possible if held at Grimm's office in Pleasant Hill or if Grimm's expenses were paid to go to Auburn. Grimm added: "The point is that a hearing is an unnecessary exercise at this point—all the necessary information seems to be in, and the Board has made what I believe is a reasonable decision." She suggested that the Elebiaris submit any new information in writing for consideration.

After receiving this letter, the Elebiaris decided that any further efforts to obtain dispensation to keep a dog would be futile. They discharged their attorney and decided to put their condominium on the market.

On January 26, 2000, Grimm again wrote to Roullier, acknowledging that Roullier was no longer representing the Elebiaris. Disputing Roullier's claim that Auburn Woods had decided against making a reasonable accommodation, Grimm wrote, "The Association does have reasonable accommodations for people who want companion pets, and the pets include cats, rabbits, hamsters,

guinea pigs, birds, etc. Ms. Elebiari could have a pet, but the fact that she prefers a dog is what is keeping her from having a companion pet accommodation."

The Elebiaris filed a complaint with DFEH on February 4, 2000, charging that Auburn Woods had discriminated against them by failing to make a reasonable accommodation for their disabilities by refusing to permit them to keep a companion dog.

Investigators contacted the Elebiaris' treating doctors, Dr. Schnitzler and Dr. Lasser. On May 10, 2000, Dr. Lasser submitted a letter to DFEH stating that the Elebiaris, "both impaired by depression, need to be able to have their dog, which they are quite attached to, to improve their depressive mood impairments. They appear to meet the criteria for deserving this accommodation due to their impairment under the disabilities act, in my opinion."

In July 2000, the Elebiaris sold their condominium and moved to Oklahoma.

In February 2001, DFEH issued an accusation charging Auburn Woods with disability discrimination based on the failure to provide reasonable accommodation of the Elebiaris' mental disabilities by denying their request to keep a companion dog.

Numerous witnesses testified in a lengthy hearing. The Elebiaris argued that they had made their disabilities known to Auburn Woods and that keeping a companion dog was a reasonable accommodation for their mental disabilities. Jayne testified that Auburn Woods never interviewed them or sought additional medical records. Auburn Woods never asked for a medical release for the Elebiaris' records.

Auburn Woods argued that it did not know the exact nature of the Elebiaris' disabilities or the reasons why the accommodation request was necessary until May 2000, when it learned of Dr. Lasser's letter. Attorney Grimm testified that she had asked Attorney Roullier for verification of the disabilities but no documentation was forthcoming. However, her records did not reflect that such a request had been made.

The administrative law judge concluded that the Elebiaris were disabled and that defendants had notice of their disabilities. She specifically found not credible Grimm's representation that she had requested documentation of the Elebiaris' medical conditions. She stated that "[i]t is not disputed that [Auburn Woods] may have been entitled to further factual information,

including medical documentation, supporting [the Elebiaris'] request for accommodation, if [Auburn Woods] had requested this information. However, the evidence established that [Auburn Woods] did not ask [the Elebiaris] for any further substantiating documents." She added that the Elebiaris "and their attorney were willing to supply further documents, but simply did not know what [Auburn Woods] wanted. It is not reasonable to expect an individual seeking reasonable accommodation to have to speculate about what further information a respondent may be seeking."

The judge further ruled that a companion dog would have been a reasonable accommodation in this case, and that Auburn Woods's repeated denials constituted unlawful discrimination. As part of the ordered remedy, the judge awarded Ed $5,000 and Jayne $7,500 in emotional distress damages.

On May 7, 2002, the FEHC adopted the proposed decision. Auburn Woods filed a petition for administrative writ of mandate, but named and served only the FEHC and not the Elebiaris.

The trial court granted the requested relief, finding there was no medical evidence to support the Elebiaris' request for accommodation until May 2000, and that there was no evidence that a companion dog was a necessary reasonable accommodation. The court also found that emotional distress damages were based on "an inappropriate standard."

Upon learning of the court proceedings, the Elebiaris filed an application to intervene so that they could appeal the court's decision. The court granted the motion, and both the FEHC and the Elebiaris filed notices of appeal.

DISCUSSION

I

*Joinder*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II

*Reasonable Accommodation*

Certain well-established principles guide our analysis. FEHA is to be "construed liberally" and is not intended to repeal other anti-discriminatory measures "unless those provisions provide less protection to

---

[*]See footnote, *ante,* page 1578.

the enumerated classes of persons . . . ." (§ 12993, subd. (a).) Section 12955.6 reinforces the broad scope of FEHA by providing that nothing in FEHA provisions "shall be construed to afford to the [protected classes] fewer rights or remedies than the federal Fair Housing Amendments Act of 1988 [FHA] . . . and its implementing regulations . . ., or state law relating to fair employment and housing as it existed prior to the effective date of this section. . . . This part may be construed to afford greater rights and remedies to an aggrieved person than those afforded by federal law and other state laws." (See also *Konig v. Fair Employment & Housing Com.* (2002) 28 Cal.4th 743, 750 [123 Cal.Rptr.2d 1, 50 P.3d 718].)

■ "FEHA in the housing area is thus intended to conform to the general requirements of federal law in the area and may provide greater protection against discrimination." (*Brown v. Smith* (1997) 55 Cal.App.4th 767, 780 [64 Cal.Rptr.2d 301].) In other words, the FHA provides a minimum level of protection that FEHA may exceed. Courts often look to cases construing the FHA, the Rehabilitation Act of 1973, and the Americans with Disabilities Act of 1990 when interpreting FEHA. (*Spitzer v. Good Guys, Inc.* (2000) 80 Cal.App.4th 1376, 1384 [96 Cal.Rptr.2d 236].) Similarly, principles at issue in cases of employment discrimination are often applied in housing discrimination cases. (See *Brown v. Smith, supra,* 55 Cal.App.4th at p. 782.)

We grant the Elebiaris' request for judicial notice of DFEH and HUD decisions, filed January 16, 2004.

■ In reviewing a decision of the FEHC, we acknowledge that the Commission's interpretation of FEHA "is entitled to great respect." (*Johnson Controls, supra,* 218 Cal.App.3d at p. 532.)

With these principles in mind, we turn to the issues presented in this appeal.

The Elebiaris and FEHC assert that the trial court erred in overturning the FEHC decision because substantial evidence supported the FEHC determination that Auburn Woods discriminated by refusing a reasonable accommodation for the Elebiaris' disabilities. We agree.

Initially, we note that, contrary to Auburn Woods's suggestions, the FEHC decision did not improperly shift any burdens or make a per se ruling that disabled individuals are entitled to have companion dogs despite CC&R's to the contrary. The FEHC decision was fact specific, holding only that the Elebiaris had established that a companion dog was a reasonable accommodation in their case.

■ Unlawful housing discrimination under FEHA includes the "refusal to make reasonable accommodations in rules, policies, practices, or services when those accommodations may be necessary to afford a disabled person equal opportunity to use and enjoy a dwelling." (§ 12927, subd. (c)(1).) Mental disabilities fall within the purview of this provision and, at the time of this litigation, included "[a] physical or mental impairment that substantially limits one or more of a person's major life activities." (Stats. 1992, ch. 182, § 10, p. 919.)

We note that, currently, section 12955.3 explicitly states that "disability" includes "any physical or mental disability as defined in Section 12926." That statute in turn defines "mental disability" to include "any mental or psychological disorder or condition . . . that limits a major life activity" (§ 12926, subd. (i)(1)), that is, "makes the achievement of the major life activity difficult." (§ 12926, subd. (i)(1)(B).) "Major life activities" is to be broadly construed, and includes "physical, mental, and social activities and working." (§ 12926, subd. (i)(1)(C).)

■ In order to establish discrimination based on a refusal to provide reasonable accommodations, a party must establish that he or she (1) suffers from a disability as defined in FEHA, (2) the discriminating party knew of, or should have known of, the disability, (3) accommodation is necessary to afford an equal opportunity to use and enjoy the dwelling, and (4) the discriminating party refused to make this accommodation. (See § 12927, subd. (c); *Giebeler v. M & B Associates* (9th Cir. 2003) 343 F.3d 1143, 1147; *Janush v. Charities Housing Development Corp.* (N.D.Cal. 2000) 169 F.Supp.2d 1133, 1135 (*Janush*).) Substantial evidence supported the FEHC decision on each of these points.

The Elebiaris presented evidence at the FEHC hearing that they were disabled within the meaning of FEHA. Ed Elebiari had suffered serious head injuries after an automobile accident and underwent three brain surgeries. He has severe headaches and suffers from depression, and occasionally experiences seizures. Ed testified that there are days when he feels he is just "barely staying alive." Dr. Schnitzler diagnosed him as having bipolar disorder, obsessive-compulsive personality disorder, and seizure disorder.

Jayne Elebiari was diagnosed as suffering from "major depression, recurrent." When an episode of depression occurs, she has difficulty sleeping, cannot concentrate, and avoids social contacts. She also engages in acts of self-mutilation by tearing off her toenail.

■ Numerous cases under state and federal law have held that depression and its related manifestations can meet the definition of disability under

antidiscrimination laws. (E.g., *Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 258–259 [102 Cal.Rptr.2d 55]; *Taylor v. Phoenixville School District* (1999) 184 F.3d 296, 306; *Criado v. IBM Corporation* (1st Cir. 1998) 145 F.3d 437, 442; *HUD v. Riverbay Corporation* (1994) HUDALJ 02-93-0320-1, p. 12.) Auburn Woods does not contend otherwise; it focuses on when it learned of the Elebiaris' disability and the reasons for their request for accommodation, not on whether these mental disorders can constitute a disability under FEHA.

There was abundant evidence introduced at the hearing that the Elebiaris' disabilities interfered with the use and enjoyment of their home, and that having a dog improved this situation. Ed testified that having a dog forced him outside of the apartment. He took the dog for walks and rides. Jayne described how her depression and related symptoms improved after getting the dog. She no longer sat around the house brooding but instead paid attention to the dog's needs. Dr. Schnitzler testified that Ed had a brighter affect and was more social after getting the dog. Jayne's mental health also benefited from having the dog. This evidence established the requisite causal link between the Auburn Woods no-pets policy and the interference with the Elebiaris' use and enjoyment of their condominium. (See *U.S. v. California Mobile Home Park Management Company* (9th Cir. 1997) 107 F.3d 1374, 1381.)

We reiterate that the FEHC did not rule that companion pets are always a reasonable accommodation for individuals with mental disabilities. Each inquiry is fact specific and requires a case-by-case determination. (*U.S. v. California Mobile Home Park Management Company, supra*, 107 F.3d at p. 1380.) But it is clear that, under the right circumstances, allowing a pet despite a no-pets policy may constitute a reasonable accommodation. For example, in *Janush, supra*, 169 F.Supp.2d 1133, a tenant suffered from "a severe mental health disability," and kept two birds and two cats to "lessen the effects of this disability." (*Id.* at p. 1134.) The landlord charged the tenant with violating the no-pets clause of her rental agreement, and the tenant in turn charged the landlord with discrimination based on refusal to provide reasonable accommodation for her disability as required under the FHA. (*Id.* at pp. 1134–1135.) The court refused to grant the landlord's motion for summary judgment, finding that triable issues of fact remained as to "[w]hether it is a reasonable accommodation for this landlord to allow this disabled tenant to keep animals in an apartment where pets are not generally permitted." (*Id.* at p. 1136.) In so ruling, the court implicitly rejected the notion that permitting a pet can never be a reasonable accommodation.

In *Crossroads Apartments Associates v. LeBoo* (1991) 152 Misc.2d 830 [578 N.Y.S.2d 1004], the court also held that triable issues of fact existed as

to whether a mentally ill tenant required a cat in order to use and enjoy his apartment. In that case, mental health professionals had presented conflicting affidavits. Some had concluded that the tenant received therapeutic benefits from caring for his cat, and that "the keeping of the cat assists him in his use and enjoyment of his apartment by helping him cope with the daily manifestations of his mental illness." (*Id.* at p. 1007.) Another psychiatrist disagreed. (*Ibid.*) The court concluded there was a triable issue of fact as to whether "this cat is necessary for [the tenant] to use and enjoy his apartment." (*Ibid.*; see also *Whittier Terrace Associates v. Hampshire* (1989) 26 Mass.App.Ct. 1020 [532 N.E.2d 712, 712–713].)

Similarly, in *Majors v. Housing Authority of the County of DeKalb Georgia* (5th Cir. 1981) 652 F.2d 454, a summary judgment proceeding under the federal Rehabilitation Act, the court ruled that a reasonable accommodation could include an exception to a "no pets" rule to permit a companion dog for a psychologically disabled tenant. (*Id.* at pp. 457–458.)

Administrative decisions under the FHA reach the same conclusion. In *HUD v. Riverbay Corporation, supra,* HUDALJ 02-93-0320-1, a tenant who suffered from severe depression claimed her landlord violated the FHA by refusing to permit her to keep a dog. As in the Elebiaris' case, the tenant obtained the dog before requesting an accommodation. The administrative law judge found the tenant to be disabled (*id.* at p. 12), and found that permitting a dog would constitute a reasonable accommodation in this case. "[The tenant's] dog enables her to experience the ordinary feelings enjoyed by persons not otherwise afflicted with her disability. Although [the landlord] asserts that the soothing benefit of dogs can be enjoyed by all, it fails to acknowledge the terrier's special benefit for [the tenant]. She testified that she relates to the dog in a way she cannot relate to people, and that through this relationship she has become stronger and more outgoing. [A doctor] testified that the terrier is a medical necessity for [the tenant's] well-being. In effect, the dog gives [the tenant] the same freedom that a wheelchair provides a physically disabled person." (*Ibid.*) The court noted that this waiver applied only to the tenant "to allow her to keep her dog that her disability necessitates. The [FHA] protects a person with a mental disability to the same degree it protects a person with a physical disability. . . . [¶] . . . [T]he [landlord's] no-pets rule will not be affected. Only the narrow group of people whose disability requires the companionship of a pet would be permitted to harbor such pets." (*Id.* at p. 13.)

In *HUD v. Dutra* (1996) HUDALJ 09-93-1753-8, a disabled tenant's enjoyment of his apartment and quality of life greatly increased by having a pet cat. (*Id.* at p. 12.) The administrative law judge concluded that the tenant had established "need for exemption from the no-pet rule and being allowed

to keep his cat in his apartment. The evidence supports finding that allowing [the tenant] to keep his cat would accommodate [the tenant's] handicap and allow him equal opportunity to enjoy and use his . . . apartment." (*Ibid.*)

Auburn Woods challenges the propriety of relying on HUD decisions. In its statement of decision, the FEHC ruled that "[a]llowing a person with a disability to have a companion animal in a housing environment where no pets or dogs are permitted can constitute a form of reasonable accommodation." As support for this statement, it utilized a "see" cite to *Janush, supra,* 169 F.Supp.2d 133, and the two FHA HUD decisions just discussed, *HUD v. Riverbay Corporation, supra,* HUDALJ 02-93-0320-1, and *HUD v. Dutra, supra,* HUDALJ 09-93-1753-8. On appeal, Auburn Woods contends the FEHC erred in relying on nonprecedential administrative opinions for its decision. This claim is patently unmeritorious. First, the statutes that Auburn Woods relies on (§§ 11425.10, subd. (a)(7), 11425.60, 12935, subd. (h)) are part of the Administrative Procedures Act and apply to state, not federal, agencies. (See § 11410.20.) These statutes serve to prohibit a California administrative agency from relying on *its own* nonprecedential decisions. Because the cases at issue here are HUD decisions under the FHA, not FEHC decisions, the statutory prohibitions cited by Auburn Woods are inapplicable. Second, nothing in the FEHC decision supports Auburn Woods' claim that the FEHC believed itself to be bound by the HUD decisions. There is nothing improper in citing these cases for their persuasive value (*Duke v. Workers' Comp. Appeals Bd.* (1988) 204 Cal.App.3d 455, 460 [251 Cal.Rptr. 185]), and that is in fact the reason we have included these cases in our discussion as well. Finally, Auburn Woods ignores the fact that the trial court included a citation to *Janush,* a case of the federal district court. The FEHC decision was grounded in both administrative decisions *and* judicial case law. Consequently, Auburn Woods cannot establish that it was prejudiced by citations to the challenged administrative decisions.

In sum, the question of whether a companion animal is an appropriate and reasonable accommodation for a disability is a question of fact, not a matter of law. Here, the Elebiaris presented evidence that their disabilities substantially limited their use and enjoyment of their condominium, and having a companion dog improved that situation. The fact that Jayne was capable of working and was sometimes able to function well at home does not mean that her disabilities did not interfere with the use and enjoyment of her home. A substantial limitation on use and enjoyment does not require an individual to be incapable of any use and enjoyment of her home. "To say that no one is disabled under [FEHA] unless the person is unable to [use and enjoy her home] would render all the provisions in [FEHA] governing reasonable accommodations . . . entirely empty of meaning." (*Taylor v. Phoenixville School District, supra,* 184 F.3d at p. 311.)

The FEHC's decision that a companion dog in this case constituted a reasonable accommodation for the Elebiaris' disabilities was supported by substantial evidence, and the trial court erred in reaching a contrary conclusion. (See *Johnson Controls, supra,* 218 Cal.App.3d at pp. 531–532.)

Auburn Woods suggests that requiring it to allow the Elebiaris' dog is per se unreasonable under FEHA because the dog did not qualify as a "service dog" as defined in Civil Code section 54.1. That is, Pooky was not "individually trained to the requirements of the individual with a disability, including, but not limited to, minimal protection work, rescue work, pulling a wheelchair, or fetching dropped items." (Civ. Code, § 54.1, subd. (b)(6)(C)(iii).)

■ This assertion mixes apples with oranges. The Elebiaris did not claim housing discrimination under the Civil Code provisions related to disabled people (§ 54 et seq.), but instead filed suit under FEHA. These are distinct statutory schemes, and it is FEHA's provisions that apply here. Consequently, even if an animal does not qualify as a service animal, there is no basis for asserting that there is no duty to reasonably accommodate nonservice animals. (*Janush, supra,* 169 F.Supp.2d at pp. 1135–1136.) This is particularly true given that FEHA is to be construed "to afford greater rights and remedies to an aggrieved person than those afforded by . . . other state laws." (§ 12955.6.)

And, because a service animal was not at issue here, there was no requirement that the Elebiaris present evidence that their dog was specially trained to alleviate their disabilities. Pooky did not need special skills to help ameliorate the effects of the Elebiaris' disabilities. Rather, it was the innate qualities of a dog, in particular a dog's friendliness and ability to interact with humans, that made it therapeutic here.

We turn to the heart of this appeal, namely, the issue of when Auburn Woods learned of the Elebiaris' disabilities and the need for accommodation. As previously noted, a party seeking to prove discrimination based on a refusal to provide reasonable accommodations must establish that the discriminating party knew of, or should have known of, the disability. (*Giebeler v. M & B Associates, supra,* 343 F.3d at p. 1147; *Janush, supra,* 169 F.Supp.2d at p. 1135.)

The Elebiaris first notified Auburn Woods of their disabilities and the need for a dog in a letter in September 1999. Jayne asked for "a reasonable accommodation to [her] impairment by waiving the prohibition against 'dogs,' " and she stated that having a dog alleviated some of the adverse effects of her disability. Jayne attached a letter from Dr. Schnitzler that stated that Jayne had been receiving psychiatric care and that her "emotional

well-being improved after purchasing a companion dog." Dr. Schnitzler recommended that Jayne be permitted to keep her dog.

In October 1999, Dr. Schnitzler wrote a second letter, stating that Ed was permanently disabled and was receiving psychiatric care. Dr. Schnitzler stated that Ed's "emotional well-being improved substantially with the purchase of a companion dog," and he recommended that Ed be allowed to keep the dog.

Grimm, the attorney for Auburn Woods, wrote Dr. Schnitzler to ask that he identify Jayne's "handicap" and explain the causal relationship between the dog and improvement in Jayne's condition. She also asked whether a cat might provide the same benefit.

On October 14, 1999, the Elebiaris' attorney wrote to Grimm and outlined the Elebiaris' precise medical conditions. He stated: "Ed Elebiari is handicapped by reason of Hydrocephalus, Manic Depression, Seizure Disorder, and is a recipient of SSDI benefits . . . . Jayne Elebiari suffers from Clinical Depression, Hypertension, Diabetes, and Arthritis. . . ." He also told Grimm that "[f]urther medical evidence of their conditions can be made available upon request."

Apparently, this response satisfied Auburn Woods, at least in part, because its subsequent communications with the Elebiaris did not raise any other concerns regarding the nature of the Elebiaris' disabilities. Instead, they focused exclusively on the question of whether a dog was an appropriate accommodation. Grimm told the Elebiaris' attorney on November 9 that a cat, but not a dog, would be acceptable. But Jayne explained to the board on December 1 that she was allergic to cats. She reiterated that she had recurrent clinical depression, that Ed was disabled, and that having a dog alleviated their depression.

Grimm responded "that the determination is that the Association offers a reasonable accommodation to people who wish to have companion pets, and that is to allow them to have a cat." She repeated this assertion in a January 2000 letter stating, "The Association does have reasonable accommodations for people who want companion pets, and the pets include cats, rabbits, hamsters, guinea pigs, birds, etc. Ms. Elebiari could have a pet, but the fact that she prefers a dog is what is keeping her from having a companion pet accommodation."

As these communications make clear, once the Elebiaris spelled out the precise nature of the disabilities at issue, Auburn Woods no longer questioned whether the Elebiaris were disabled. Instead, its focus turned to the question of what constituted a reasonable accommodation. But Auburn Woods asked

no questions about the Elebiaris' condition after October 1999 and never sought to obtain the Elebiaris' medical records despite being told that these records were available upon request. The administrative law judge characterized as unbelievable Grimm's claim that she asked for medical verification of the need for the requested accommodation.

As one court noted, "If a landlord is skeptical of a tenant's alleged disability or the landlord's ability to provide an accommodation, it is incumbent upon the landlord to request documentation or open a dialogue." (*Jankowski Lee & Associates v. Cisneros* (7th Cir. 1996) 91 F.3d 891, 895.) This obligation to "open a dialogue" with a party requesting a reasonable accommodation is part of an interactive process in which each party seeks and shares information. (E.g., *Jensen v. Wells Fargo Bank, supra,* 85 Cal.App.4th at p. 266; *Spitzer v. Good Guys, Inc., supra,* 80 Cal.App.4th at pp. 1384–1385; *Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 949–950 [62 Cal.Rptr.2d 142]; *Loulseged v. Akzo Nobel Inc.* (5th Cir. 1999) 178 F.3d 731, 735–736 and fn. 5.) As one court noted in the context of a claim of employment discrimination: "Once the employer knows of the disability and the employee's desire for accommodations, it makes sense to place the burden on the employer to request additional information that the employer believes it needs. Disabled employees, especially those with psychiatric disabilities, may have good reasons for not wanting to reveal unnecessarily every detail of their medical records because much of the information may be irrelevant to identifying and justifying accommodations, could be embarrassing, and might actually exacerbate workplace prejudice. . . . [¶] . . . [Moreover], an employee with a mental illness may have difficulty effectively relaying medical information about his or her condition, particularly when the symptoms are flaring and reasonable accommodations are needed." (*Taylor v. Phoenixville School District, supra,* 184 F.3d at p. 315.)

The same is true here. (See *Brown v. Smith, supra,* 55 Cal.App.4th at p. 782 [principles at issue in cases of employment discrimination may be applied in cases of housing discrimination].) If Auburn Woods needed additional information about the Elebiaris' medical condition or their need to keep Pooky, it was obligated to request it. It could not simply sit back and deny a request for reasonable accommodation because it did not think sufficient information had been presented or because it did not think the Elebiaris had spoken the "magic words" required to claim the protections of FEHA. (See *Prilliman v. United Airlines, Inc., supra,* 53 Cal.App.4th at p. 954.)

Auburn Woods points to portions of Dr. Schnitzler's testimony at the administrative hearing as evidence of the fact that the Elebiaris were not in fact disabled. Auburn Woods's position is based on a selective reading of this

testimony and does not accurately reflect the gist of the psychiatrist's testimony. More importantly, Auburn Woods did not rely on Dr. Schnitzler's still-to-come testimony when it denied the Elebiaris' request. It had evidence of the Elebiaris' disabilities from the Elebiaris, their attorney and their doctor. It apparently found this evidence credible because, as already pointed out, Auburn Woods then focused on the type of accommodation required, not on whether the Elebiaris were disabled. Under these circumstances, it is disingenuous (at best) for Auburn Woods now to call these disabilities into question.

Finally, Auburn Woods contends that there was no refusal to accommodate because, in June 2000, it offered to permit the Elebiaris to keep a dog, thus effecting a "conciliation" of the Elebiaris' discrimination claim. The terms of this offer are not part of the record below, and there is no evidence that the Elebiaris accepted this offer to resolve their discrimination claim. To the contrary, the evidence established that the Elebiaris repeatedly made their needs known and offered to provide additional medical evidence to support their claim. Auburn Woods never requested that information and instead, over a nine-month period, from September 1999 until late June 2000, repeatedly denied their request for reasonable accommodation. It did not explain its position other than to present an inflexible response: no dogs.

▮ When the reasons for a delay in offering a reasonable accommodation are subject to dispute, the matter is left for the trier of fact to resolve. (*Armstrong v. Reno* (D.C. 2001) 172 F.Supp.2d 11, 23.) The administrative law judge properly characterized this lengthy delay as a refusal to provide reasonable accommodation. (See *Groome Resources Ltd., L.L.C. v. Parish of Jefferson* (5th Cir. 2000) 234 F.3d 192, 199; *Krocka v. Riegler* (N.D.Ill. 1997) 958 F.Supp. 1333, 1342; *James v. Frank* (S.D.Ohio 1991) 772 F.Supp. 984, 992.)

▮ In all, the evidence presented at the administrative hearing supports the administrative law judge's finding that Auburn Woods violated FEHA by failing to permit the Elebiaris to keep a dog as a reasonable accommodation to their disabilities. The trial court erred in reweighing the evidence and overturning the FEHC's decision. (*Johnson Controls, supra*, 218 Cal.App.3d at pp. 531–532.)

III

*Damages for Emotional Distress*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[*]See footnote, *ante*, page 1578.

---

DISPOSITION

The judgment is reversed. Appellants are awarded their costs on appeal.

Scotland, P. J., and Butz, J., concurred.

Respondents' petition for review by the Supreme Court was denied November 10, 2004. Chin, J., was of the opinion that the petition should be granted.